STATE of Tennessee, Appellee,

v.

James Lee JONES, Appellant.

Supreme Court of Tennessee,
Middle Section.

April 2, 1990.

Rehearing Denied May 14, 1990.

**546**

Richard H. Dinkins, Williams & Dinkins, Nashville, for appellant.

Charles W. Burson, Atty. Gen. and Reporter, Kymberly Lynn Anne Hattaway, Asst. Atty. Gen., Nashville, for appellee.

## OPINION

O'BRIEN, Justice.

James Lee Jones was convicted in the Davidson County Criminal Court on a three count indictment charging him with first degree murder, assault with intent to commit first degree murder with bodily injury, and armed robbery. He received a death sentence on the murder charge and life sentences on each of the other convictions

with the sentences to be served consecutively to the sentence for murder and consecutively to each other.

The defendant has raised several issues which are broken down into a number of sub-issues. The first of these issues raised relates to the selection and composition of the jury. The defendant says these proceedings deprived him of constitutional rights secured by the First, Fifth, Sixth and Fourteenth Amendments to the United States Constitution and Article I, §§ 6, 8 and 9 of the Tennessee Constitution.

Article I, § 6 of the Tennessee Constitution provides:

"That the rights of trial by jury shall remain inviolate, and no religious or political test shall ever be required as a qualification for jurors."

Defendant says the constitutional rights delineated in the foregoing section, as well as in § 8 of Article I invoke the protections afforded to him by the Fifth and Fourteenth Amendments to the United States Constitution.

█ Several prospective jurors, Vivian Lankford, Sharon Woods, Doris Haley, Mary Majors and Sandra Smith stated on voir dire that they were unable to consider the death penalty as a possible punishment. Each of them, to one degree or another, assessed their reason to be associated with their religious beliefs. Jurors Velva Hereford and Christine Northcutt also assessed their predisposition against the death penalty to have some relationship with their religious teachings and belief. Challenges for cause to each of these jurors was sustained by the trial court. Defendant insists that the questions put to the prospective jurors clearly constituted a religious test within the meaning of the State and Federal Constitution. Defendant concedes the State has a right to jurors who can make the discretionary judgment entrusted to them by the State and can thus obey the oath taken as a juror.

We have considered this record carefully and conclude that the response of this Court in *State v. Bobo*, 727 S.W.2d 945, 949 (Tenn.1987), is pertinent to the issue raised here. In that case the Court said:

"Defendant says that the trial court excluded jurors from service on the jury who were opposed to the death penalty on religious grounds, amounting to a religious test for jury service in violation of Article I, § 6, Tennessee Constitution.... We have read the voir dire carefully and, while some jurors said their opposition to and inability to impose the death penalty, regardless of the evidence adduced, was based in whole or in part on religious grounds, those jurors were excused because their views on capital punishment rendered them unable to follow the law as given to them by the court and to perform their duties as jurors in accord with their oaths. That their views on capital punishment may have had a religious foundation does not necessarily transform the test mandated by the United States Supreme Court in *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), and *Wainwright v. Witt*, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), into religious tests for ... [constitutional purposes]."

█ Defendant says a further constitutional violation was the exclusion of jurors for cause based on their opposition to the imposition of the death penalty, coupled with the State's exercise of its peremptory challenges, which deprived him of a fair and impartial jury.

To the extent that defendant challenges general death-qualification of the jury, there is no merit to his argument. In *Lockhart v. McCree*, 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986), the United States Supreme Court held that the exclusion of *"Witherspoon* excludables" from a jury that decides guilt or innocence in a bifurcated trial does not violate a defendant's Sixth Amendment rights even assuming that "death-qualification" results in juries that are more conviction prone than "non-death qualifying" juries. This Court rejected a similar argument in *State v. Coker*, 746 S.W.2d 167, 171 (Tenn.1987), the issue is without merit.

Defendant says the exercise by the State of its peremptory challenges to exclude black persons from the jury deprives him of rights under Article I, § 6 and 8 of the Tennessee Constitution and the Fourteenth Amendment to the United States Constitution. He relies on the authority of *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986) and *Strauder v. West Virginia,* 100 U.S. 303, 25 L.Ed. 664 (1880) for the premise that he has a right to be tried by a jury whose members are selected pursuant to non-discriminatory criteria. He seems to argue that the Attorney General's actions in accepting some black jurors and rejecting others by the exercise of peremptory challenges was somehow purposeful racial discrimination in the selection of the jury panel. In *State v. Bell,* 745 S.W.2d 858, 865 (Tenn.1988) this Court stated, "the exercise of peremptory challenges by the State for purely racial reasons violates the equal protection clause," specifically citing *Swain v. Alabama,* 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965) and *Batson v. Kentucky,* supra. We noted that in *Batson* the court overturned the evidentiary requirements of *Swain,* and held:

"... [A] defendant may establish a prima facie case of purposeful discrimination in selection of the petit jury solely on evidence concerning the prosecutor's exercise of peremptory challenges at the defendant's trial. To establish such a case, the defendant first must show that he is member of a cognizable racial group ... and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race. Second, the defendant is entitled to rely on the fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice that permits 'those to discriminate who are of a mind to discriminate' ... [F]inally, the defendant must show that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race. This combination of factors in the impanelling of the petit jury, as in the selection of the venire, raises the necessary inference of purposeful discrimination...."

In the supplementary opinion on remand in *State v. Bell,* at 759 S.W.2d p. 653 this Court spoke to the issue thusly:

"It is not unconstitutional, without more, to strike one or more blacks from the jury. If a defendant objects the judge may not require the prosecutor to respond at all. If he does, the prosecutor, who in most cases has had a chance to voir dire the prospective jurors, will have an opportunity to give trial related reasons for his strikes—some satisfactory ground other than the belief that black jurors should not be allowed to judge a black defendant. (See *Batson,* supra, 106 S.Ct. at p. 1725, White, Justice, concurring.)

In the present case the defendant is black as were his victims. The prosecution exercised five peremptory challenges, three against prospective black jurors, two against prospective white jurors. Two blacks actually served as jurors, one as an alternate.

The prosecutor responded for the record to defense counsel's challenge to the selection process. He explained that he had sought to include blacks because he felt they would understand the circumstances of the case. Of the three black jurors excused, he stated that prospective juror William Green "gave us trouble" on several of his answers. He did not favor the death penalty and while qualified under *Wainwright v. Witt* he appeared hesitant on this issue. Green's position as an elder in the Church of Christ might also compromise his role as a juror because, the prosecutor believed, he would have to explain his decision if he voted for death to his congregation under practices of the denomination. Mr. Green also seemed to be reluctant to sit on the jury for religious reasons and his answers were ambiguous on whether his religious feelings were so strong they would affect his decision making.

The prosecutor's explanation for excusing prospective juror Sharon Baker

was based upon her views about the death penalty and her demeanor during voir dire. In respect to this latter factor, the prosecutor noted that she avoided eye contact with him as he questioned her and with other people. She appeared disinterested in the proceedings and read a book in the jury box when other jurors were listening to the questions that were asked. She was not communicative during her voir dire and gave "short cryptic answers." In reference to the death penalty she gave the impression she would only vote for the death penalty if the defendant would not serve a complete life term. She was also the only juror who referred to rendering a death sentence as a "killing." The prosecutor was of the opinion these feelings could be easily manipulated by defense counsel to assure she would not vote for a death penalty if chosen as a juror. The third juror challenged, Robert Thomas, appeared uneducated and lacking the communicative skills of the other jurors. However, the primary reason for excusing him as a juror was because he was a close friend of defense counsel from whom he had solicited money for the church he once pastored.

The trial court held that the defendant had failed to make out a prima facie case. We agree. There was no pattern of strikes against black jurors. There was no indication of any discriminatory purpose in the strikes. The State offered neutral reasons for the exercise of its challenges. We find the issue to be without merit on each of the constitutional grounds raised by defendant. *Wainwright v. Witt*, supra at 105 S.Ct. 844; *Batson v. Kentucky*, supra; *Holland v. Illinois*, — U.S. —, 110 S.Ct. 803, 107 L.Ed.2d 905 (1990).

■ Defendant says it was error to deny challenges for cause of prospective jurors and this action on the part of the trial court denied him a fair trial.

There is no basis for this objection. In *Ross v. Oklahoma*, 487 U.S. 81, 108 S.Ct. 2273, 2279, 101 L.Ed.2d 80 (1988) speaking in reference to Oklahoma law, the court had this to say:

"It is long settled principle of Oklahoma law that a defendant who disagrees with the trial court's ruling on a for cause challenge must, in order to preserve the claim that the ruling deprived him of a fair trial, exercise a peremptory challenge to remove the juror. Even then, the error is grounds for reversal only if the defendant exhausts all peremptory challenges and an incompetent juror is forced upon him."

This rule has long prevailed in the State of Tennessee. See *Hale v. State*, 198 Tenn. 461, 281 S.W.2d 51, 56 (1955).

Defendant questions the sufficiency of the evidence to sustain his conviction for robbery.

■ Defendant was charged in the indictment with theft, by robbery, of approximately $300 and the victim's First American Bank card. The robbery was also used as an aggravating factor in seeking the death penalty. In reference to the $300 the evidence was that it was kept in an envelope in a jewelry box on top of a chest of drawers in the bedroom occupied by the adults. The money was missing after the assault and the murder. Defendant was not seen with the money however he had been in the bedroom where the money was kept. A purse owned by Norma Norman, which was kept in the bedroom, was found lying open on the bed with its contents strewn about on the bed. Defendant had asked the victim Daniels where his money was kept. Additional evidence was that defendant had stolen marijuana and the bank card while committing the offenses. While the evidence was circumstantial we are of the opinion it was sufficient to support the defendant's conviction of armed robbery of the money. It is also argued that defendant could not be convicted of armed robbery on the basis of his taking the bank card because the State failed to establish the value of the card. The elements of the offense of robbery are the taking of goods from a person by forcible means or violence or putting the person in fear. *State v. Henderson*, 620 S.W.2d 484 (Tenn.1981). Taking from the person may be either actual or constructive for the

purpose of a robbery conviction. It is actual when the taking is immediately from the person and constructive when in the possession of the victim or in the victim's presence. See *State v. Miller*, 608 S.W.2d 158 (Tenn.Cr.App.1980). The value of the property taken is immaterial. See *Cook v. State*, 3 Tenn.Cr.App. 685, 466 S.W.2d 530, 532 (1971). Any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 2782, 61 L.Ed.2d 560 (1979); T.R.A.P. 13(e).

■ It is defendant's insistence that the proof introduced was insufficient to establish that the murder of Patrick Daniels was especially heinous, atrocious or cruel and therefore the death penalty was unconstitutionally invoked. He argues that the State must show that he inflicted torture on the victim prior to death or that he committed acts evincing a depraved state of mind.

The victim in this case was bound, gagged, and blindfolded with duct tape. He was distressed, crying and begging not to be hurt. Defendant stood over him and stabbed him six times, four times penetrating the heart. He then watched as the victim went into convulsions, blood spewing from his nose and mouth. His accomplice testified, "he was working himself up on a rhythm," he was "cool" and "under control." The victim continued to plead with the defendant as he was being stabbed.

The jury found three aggravating circumstances, (1) defendant was previously convicted of one or more felonies other than the present charge which involved the use of threat or violence to the person; (2) the murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind; (3) the murder was committed while the defendant was engaged in committing, or attempting to commit, any first degree murder or robbery. There is no doubt that the evidence in this case was sufficient to support each of the aggravating circumstances found by the jury. This issue is without merit.

■ Defendant contends that the evidence adduced at trial is insufficient to sustain the jury's guilty verdict of first degree murder because his conviction was predicated, in part, upon the testimony of his co-defendant, Harold Miller. It is true, as defendant says, that there was some contradiction between the testimony of the accomplice and other of the State witnesses. However, Miller's testimony was corroborated by the testimony of Norma Norman, one of the victim's, as well as physical evidence linking him to the offenses. The determination of credibility of the witnesses is a matter exclusively a question of fact for the determination of the jury. *State v. Sheffield*, 676 S.W.2d 542 (Tenn.1984). The jury in this case was fully aware of the discrepancies between the testimony of the accomplice and his prior statements. The testimony of the co-defendant does not invalidate the verdict. See *State v. Coker*, 746 S.W.2d 167 (Tenn.1987); *State v. Carter*, 714 S.W.2d 241 (Tenn.1986); *State v. Barnes*, 703 S.W.2d 611 (Tenn.1985). This issue is without merit.

Defendant questions the trial court overruling certain objections to questions posed by the State to witnesses at trial. He says questions asked of Norma Norman and Robert Jordan were irrelevant to any issue before the court, inflammatory, and deprived him of a fair trial.

■ In the course of the State's proof during the guilt phase of the proceedings the State was allowed to ask Norman, "what was going through your mind at that point?" [when defendant pointed a gun at her.] The witness responded that she thought defendant was going to kill her and Daniels. No objection was made to this question. The witness then testified about her two young children coming out of their bedroom. The State asked, "[A]s a mother to these two children, what is going through your mind when you see them come out there ...?" Over defendant's objection the witness was allowed to answer that she had been afraid the defendant would kill her children.

Defendant was charged with assault with intent to commit first degree murder with bodily injury against Norma Jean Norman. An assault has been defined as an

act which conveys to the mind of the person set upon a well-grounded apprehension of personal injury or violence. See *Casey v. State*, 491 S.W.2d 90, 93–94 (Tenn.Cr. App.1972). We are of the opinion the question and the response were appropriate under the circumstances. Defendant had the gun pointed between her eyes with the end of the barrel touching her. Shortly thereafter her two children came from their bedroom. The witness was asked by the State's attorney, "as a mother to these two children, what is going through your mind when you see them come out there and Mr. Jones makes this statement." The defendant had said, "if we didn't get them back in there as quick as possible he would snap one of them's head, so fast it would make her head swim." He also said that she had better get them back in their room before he killed them both. While the question in reference to the children may not have had the same relevance insofar as the assault was concerned, we are satisfied the question was harmless in view of defendant's actions.

■ Reference to the testimony of Robert Jordan related to the State's question asking the witness how defendant had reacted to seeing the movie *Scarface* about six months before the killing. This was a particularly violent movie about a Cuban refugee who rose to the top of the drug business by killing off his competitors. The witness was allowed to testify over defense objection that defendant had acted like he was "fascinated" by the movie. Defendant had identified himself as "Scarface" during the commission of the crimes. He told his victims that "he had come from Chicago to Nashville to take over because things weren't being run right, that he was there to teach them a lesson and that he was going to clean up drug dealers." We are of the opinion it was permissible for the State to link the defendant to the movie and that Jordan was competent to describe his observation of defendant's reaction to the movie. This line of questioning went pretty far afield and we consider it a practice to be avoided, however, the witness was testifying from his own observations and in view of defendant's statements in

the course of the commission of the offense it was no more than harmless error under the circumstances.

■ Defendant says that he was required to testify against himself in the sentencing phase of the proceedings. He contends it was error to allow the State to cross-examine him at the sentencing hearing on the theory that it required him to testify against himself inconsistently with his defense on the merits. His argument is that he endeavored to convince the jury at the guilt phase of the trial that at most he was guilty of second degree murder. He testified during the sentencing hearing and endeavored to cast an innocent light on the fact that he had committed the homicide.

This Court considered a similar issue in *State v. McKay*, 680 S.W.2d 447, 451 (Tenn. 1984). In that case, in response to a similar assertion of error, the Court said:

"Defendants assert that the trial judge erred in allowing the State to cross-examine each defendant about the circumstances of the offenses when they testified at the sentencing hearing. We readily agree that this would have been prejudicial error but for the fact that it was invited, if not necessitated, by the direct testimony of the defendants. In testifying during the sentencing phase of the trial, McKay and Sample asserted unequivocally their innocence of the robbery of the Sundry Store and the murders. We agree with the State's contention that defendants raised a non-statutory mitigating factor that the State was clearly entitled to rebut."

■ Defendant says the trial court should have declared a mistrial when the State passed copies of previous indictments to the jury after assuring the court that would not happen, and also in allowing a State's witness to testify as to the facts of defendant's prior convictions.

Defendant made a motion in limine prior to the sentencing hearing to prohibit any mention at the hearing that defendant was on parole at the time of the offense. In the course of arguing the motion the State's attorney stated he would not pass the records of defendant's prior *murder* con-

viction to the jury since they showed that defendant had received a life sentence and described the circumstances of the crime. Defendant's parole officer, who was identified only as an employee of the U.S. District Court in Nashville, testified to introduce the fact of defendant's two prior convictions for second degree murder and assault with a deadly weapon. The State was allowed over defense objection to ask the nature of the deadly weapon. The witness answered that it was a knife. The State's attorney then passed to the jury the record of defendant's conviction for assault with a deadly weapon which included a two-count indictment charging him with robbery in addition to the assault. Defense counsel raised an objection on the basis that the information it contained was irrelevant and requested the court to instruct the jury that the only information contained in the record which was applicable was the fact of the conviction. The trial judge gave the instruction requested.

The defense objection was appropriate. The conduct of the State's attorney bordered on deception by which he was able to get before the jury information which was not evidence in the case they had under consideration. The action of the State was improper. However, we have reviewed this record carefully and conclude that the error does not require a reversal of the defendant's sentence. In a similar situation in *State v. Williams*, 657 S.W.2d 405, 413 (Tenn.1983) the Court, citing *Judge v. State*, 539 S.W.2d 340 (Tenn.Cr.App.1976), had this to say:

"In consideration of whether improper conduct on the part of the State requires reversal, a court may look to several factors, such as the effect of curative measures taken by the trial court, the intent of the prosecution, the cumulative effect of the improper conduct and any other errors in the record, and the relative strength of the case."

We decline to remand this case for a new sentencing hearing. The defendant did not deny the homicide or the assault on the victims. He endeavored to mitigate the circumstances of the offenses by testifying that he suffered from a memory lapse regarding their occurrence. We give the

State the benefit of the doubt insofar as the intent was concerned. We do not find any cumulative effect of the improper conduct nor is there other reversible error in the record. As in *Williams*, supra, we consider it pertinent to point out that the fact of a prior sentence has nothing to do with the conviction and should not be admitted as evidence except by agreement.

■ Defendant complains that the action of the trial court in failing to set defendant's death sentence consecutive to his life sentences renders the life sentences void. It is the function of the trial judge to set terms of imprisonment to which a person is sentenced to run concurrently or cumulatively, subject to appellate review. Defendant insists the practical effect of the sentencing in this case is to render the life sentences impossible to serve. We do not think so. Where the possibility exists that a death sentence might be reversed or commuted there is no abuse of discretion on the part of the trial judge in the sentencing formula. The issue is without merit.

■ The defendant says his trial counsel and the trial court erroneously failed to introduce and/or consider proof of defendant's mental capacity as a prerequisite to the punishment phase and subsequent imposition of the death penalty. He bases this issue on his own statement to the investigating officer in the presentence report that he had been institutionalized by his family as a child when he ran away from home and on a 1972 homicide judgment in which the trial judge recommended psychiatric treatment. There is no evidence in this record or any other part of his extensive criminal record to indicate he was either incompetent to stand trial or at the time this offense was committed. There is nothing in this record to indicate a remand for a determination of defendant's mental status would be appropriate. The issue is without merit.

■ Defendant says the imposition of the death penalty in this case is a denial of due process and equal protection of the law and is disproportionate to the sentence imposed in similar cases. It is defendant's assertion that in the instant case the victim was a young drug dealer engaged in the

course of his trade when he was killed and there is no factor in the homicide which places the case into a category with those in which a life sentence has been imposed and upheld by the court.

We have previously reviewed the three aggravating circumstances found by the jury and we now find that the evidence supports the jury's finding of those aggravating circumstances and that they outweigh any mitigating circumstances. The sentence of death was not imposed in an arbitrary fashion and is not excessive or disproportionate to the penalty imposed in similar cases considering both the nature of the crime and the defendant. This Court has previously upheld the imposition of the death penalty in numerous cases involving armed robbery. See e.g., *State v. Goad*, 707 S.W.2d 846 (Tenn.1986); *State v. Zagorski*, 701 S.W.2d 808 (Tenn.1985); *State v. Duncan*, 698 S.W.2d 63 (Tenn. 1985); *State v. King*, 694 S.W.2d 941 (Tenn.1985); *State v. McKay*, supra; *State v. Workman*, 667 S.W.2d 44 (Tenn.1984); *State v. Harries*, 657 S.W.2d 414 (Tenn. 1983); *State v. Laney*, 654 S.W.2d 383 (Tenn.1983); *State v. Simon*, 635 S.W.2d 498 (Tenn.1982); *State v. Johnson*, 632 S.W.2d 542 (Tenn.1982); *State v. Dicks*, 615 S.W.2d 126 (Tenn.1981); *State v. Strouth*, 620 S.W.2d 467 (Tenn.1981); *State v. Coleman*, 619 S.W.2d 112 (Tenn. 1981); *Houston v. State*, 593 S.W.2d 267 (Tenn.1980).

The death penalty has also been upheld in numbers of cases where the jury determined that the murders were especially heinous, atrocious or cruel and that it involved torture or depravity of mind, which was certainly the case in this conviction. See *State v. Bobo*, supra; *State v. McNish*, 727 S.W.2d 490 (Tenn.1987); *State v. Hartman*, 703 S.W.2d 106 (Tenn.1985); *State v. Zagorski*, supra; *State v. Duncan*, supra; *State v. Caruthers*, 676 S.W.2d 935 (Tenn. 1984); *State v. Coe*, 655 S.W.2d 903 (Tenn. 1983); *State v. Melson*, 638 S.W.2d 342 (Tenn.1982); *State v. Strouth*, supra; *State v. Groseclose*, 615 S.W.2d 142 (Tenn. 1981); *State v. Dicks*, supra; *Houston v. State*, supra.

Death sentences have also been upheld where the jury determined that the defen-dant was previously convicted of one or more felonies involving the use of violence or the threat of violence to the person. *State v. Goad*, supra; *State v. Teague*, 680 S.W.2d 785 (Tenn.1984); *State v. King*, supra; *State v. Williams*, supra.

The Court has considered and upheld sentences of death where the evidence was that the victims were participants in a criminal enterprise with the defendant. *State v. Wright*, 756 S.W.2d 669 (Tenn.1988) (drug trafficking); *State v. Zagorski*, supra, (drug trafficking).

We therefore affirm the judgment of the trial court in its entirety. The sentence of death will be carried out as provided by law on the 10th day of June, 1990, unless otherwise ordered by this Court or by other proper authority. The costs are adjudged against the defendant.

DROWOTA, C.J., and FONES, COOPER and HARBISON, JJ., concur.

## ORDER ON PETITION TO REHEAR

**PER CURIAM.**

Upon due consideration the petition to rehear filed in this cause is denied.