*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 11a0223p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT
_____

ABU-ALI ABDUR'RAHMAN,
　　　　　　　*Petitioner-Appellant*,

　　　*v.*

ROLAND COLSON, Warden,
　　　　　　　*Respondent-Appellee*.

No. 09-5307

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 96-00380—Todd J. Campbell, Chief District Judge.

Argued: February 2, 2011

Decided and Filed: August 17, 2011

Before: BATCHELDER, Chief Judge; SILER and COLE, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Thomas C. Goldstein, AKIN GUMP STRAUSS HAUER & FELD LLP, Washington, D.C., for Appellant. Joseph F. Whalen, III, OFFICE OF THE TENNESSEE ATTORNEY GENERAL, Nashville, Tennessee, for Appellee. **ON BRIEF:** Thomas C. Goldstein, AKIN GUMP STRAUSS HAUER & FELD LLP, Washington, D.C., Bradley A. MacLean, OFFICE OF THE POST-CONVICTION DEFENDER, Nashville, Tennessee, William P. Redick, Jr., Whites Creek, Tennessee, for Appellant. Joseph F. Whalen, III, OFFICE OF THE TENNESSEE ATTORNEY GENERAL, Nashville, Tennessee, for Appellee.

　　　SILER, J., delivered the opinion of the court, in which BATCHELDER, C. J., joined. COLE, J. (pp. 14–22), delivered a separate dissenting opinion.

---

## OPINION

---

SILER, Circuit Judge.  In 1987, Abu-Ali Abdur'Rahman was convicted of first-degree murder, assault with intent to commit first-degree murder, and armed robbery. He now appeals the district court's denial of relief on his Rule 60(b) motion.  For the following reasons, we **AFFIRM**.

## BACKGROUND

On February 16, 1986, Abdur'Rahman purchased marijuana from Patrick Daniels and Norma Norman at the couple's shared apartment in Nashville, Tennessee.[1]  This purchase prompted Abdur'Rahman and his accomplice, Harold Devalle Miller, to plan to rob Daniels and Norman.  On February 17, Abdur'Rahman, armed with a shotgun, and Miller, armed with an unloaded pistol, went to Daniels's apartment under the pretense of making another drug purchase.  Brandishing their weapons once inside, Abdur'Rahman and Miller bound Daniels and Norman with duct tape, and took Daniels's bank card, $300 in cash, and marijuana.  Abdur'Rahman informed Daniels that he had been sent from Chicago to "clean up everything" and that he was there to teach Daniels a lesson.  Abdur'Rahman then took a butcher knife from the kitchen and stabbed Daniels six times in the chest.  He also stabbed Norman several times in the back before he and Miller fled.  Daniels died from his wounds, but Norman survived.

A jury convicted Abdur'Rahman of murder, assault with intent to commit first-degree murder, and armed robbery.  At sentencing, Abdur'Rahman testified that he was encouraged to commit the robbery by a "quasi-religious paramilitary group" called the Southeastern Gospel Ministry ("SEGM").  He stated that the goal of the SEGM was to "cleanse the black community of drug dealers and other undesirable elements."  He also testified that Allen Boyd, a leader within the SEGM, furnished the shotgun he used

---

[1] The facts underlying Abdur'Rahman's Tennessee convictions are derived from this court's review of his first habeas appeal, *see Abdur'Rahman v. Bell*, 226 F.3d 696, 699 (6th Cir. 2000).

during the crime, and aided him and Miller afterwards. Abdur'Rahman received the death penalty for his murder conviction and two consecutive life terms for each of his other convictions. The Tennessee Supreme Court affirmed Abdur'Rahman's convictions and sentences, *see State v. Jones*, 789 S.W.2d 545 (Tenn. 1990), and he unsuccessfully pursued state post-conviction relief, *see Jones v. State*, No. 01C01-9402-CR-00079, 1995 WL 75427, at *1–3 (Tenn. Crim. App. Feb. 23, 1995).

Abdur'Rahman filed a petition for a writ of habeas corpus under 28 U.S.C. § 2254. *Abdur'Rahman v. Bell*, 999 F. Supp. 1073 (M.D. Tenn. 1998). The district court granted relief, but we reversed and vacated the judgment. *Abdur'Rahman*, 226 F.3d at 708–09. Abdur'Rahman then filed a motion for relief under Rule 60(b). *See Abdur'Rahman v. Bell*, No. 3:96-0380, 2001 WL 1782874, at *1 (M.D. Tenn. Nov. 27, 2001). After several appeals, the district court granted Abdur'Rahman's motion to consider the merit of certain claims that it earlier concluded were procedurally defaulted in Abdur'Rahman's initial § 2254 petition. *Abdur'Rahman v. Bell*, No. 3:96:0380, 2009 WL 211133 (M.D. Tenn. Jan. 26, 2009).

Among his several claims for relief, Abdur'Rahman argued that the prosecution withheld two pieces of evidence before sentencing, in violation of *Brady v. Maryland*, 373 U.S. 83 (1963): pretrial statements made by Miller regarding the influence of the SEGM on the crime, and Detective Mark Garafola's account of Abdur'Rahman's self-destructive behavior while in police custody. With this withheld evidence, Abdur'Rahman argues that one or more jurors could have concluded that a term of life imprisonment rather than death was a more appropriate sentence in his case. The district court, however, denied relief. It held that the prosecution's suppression of Miller's pre-trial statements did not violate *Brady*, either because Abdur'Rahman already knew of this information or because the evidence was not material. *Abdur'Rahman*, 2009 WL 211133, at *7. It also held that Detective Garafola's report was not material. *Id.* at *9–10. We granted Abdur'Rahman a certificate of appealability (COA) to consider whether the district court properly rejected these two *Brady* subclaims.

**DISCUSSION**

**A. Standard of Review**

We review a district court's denial of a petitioner's habeas claims de novo. *Joseph v. Coyle*, 469 F.3d 441, 449 (6th Cir. 2006). Factual findings made by the district court are reviewed for clear error, but mixed questions of law and fact are reviewed de novo. *Boykin v. Webb*, 541 F.3d 638, 642 (6th Cir. 2008).

Abdur'Rahman filed his § 2254 habeas petition on April 23, 1996—one day before the effective date of the Antiterrorism and Effective Death Penalty Act. As a result, the pre-AEDPA standard of review applies here. *See Coleman v. Mitchell*, 268 F.3d 417, 427 (6th Cir. 2001) (citing *Mapes v. Coyle*, 171 F.3d 408, 413 (6th Cir. 1999)). Thus, we presume the correctness of state court factual findings, which are rebuttable only by clear and convincing evidence. *Id.* We review determinations of law, or determinations involving mixed questions of law and fact, de novo. *Id.* Because Abdur'Rahman's appeal was brought after AEDPA's effective date, however, AEDPA's requirement that he secure a COA still applies. *See Mackey v. Dutton*, 217 F.3d 399, 406–07 (6th Cir. 2000).

**B. Abdur'Rahman's Cumulative Error Arguments**

In addition to his individual *Brady* claims, Abdur'Rahman argues that these claims should be cumulated with the prosecutorial misconduct or *Strickland* claims he raised in his initial § 2254 petition. Even if these errors do not deny him due process when considered in isolation, Abdur'Rahman argues that the prejudice resulting from either cumulation makes his death-sentence unfair.

Because Abdur'Rahman raised these cumulative error arguments for the first time on habeas review, we may not consider them here. He suggests that we follow *Derden v. McNeel*, 978 F.2d 1453, 1456–57 (5th Cir. 1992), where an en banc Fifth Circuit permitted a habeas petitioner to raise a cumulative error argument without first making that argument before the state court below. Under our own circuit's precedent, however, cumulative error arguments must be raised separately in the state court and are

subject to procedural default on habeas review. *See Keith v. Mitchell*, 455 F.3d 662, 679 (6th Cir. 2006) (citing *Lorraine v. Coyle*, 291 F.3d 416, 447 (6th Cir. 2002)). Abdur'Rahman failed to raise these cumulative error claims on direct appeal or during post-conviction relief in state court. Instead, he only raised a generalized cumulative error argument for the first time in his habeas petition. Because we are bound by this circuit's prior precedents, *see Sandusky Mall Co. v. N.L.R.B.*, 242 F.3d 682, 692 (6th Cir. 2001), Abdur'Rahman cannot raise either cumulative error argument here.

Review of his cumulative error arguments is also foreclosed because the COA does not certify the claims for appeal. A COA is a "jurisdictional prerequisite" to the consideration of the merits of an appellant's habeas claims, *see Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003), and we may not consider claims not certified for appeal, *see* 28 U.S.C. § 2253(c); *Seymour v. Walker*, 224 F.3d 542, 561 (6th Cir. 2000). Here, the COA allows Abdur'Rahman to appeal the denial of two *Brady* subclaims and permits him to make "cumulative-effect arguments" regarding *only* those *Brady* subclaims, "even if it involves referring to *factual allegations* that underpin prosecutorial-misconduct subclaims." (emphasis added). As we explain more fully in Part C-2 below, this language acknowledges the general rule that we consider *Brady* materiality collectively, rather than looking at each suppressed item in isolation. It does not permit Abdur'Rahman to make cumulative-effect arguments regarding claims based on distinct legal theories. Because we treat cumulative error arguments as separate claims, and Abdur'Rahman's cumulative error arguments are not included within the COA, we cannot consider them here.

## C. *Brady* Claims

Abdur'Rahman argues that the prosecution violated *Brady* by withholding two pieces of evidence: Miller's pre-trial statements explaining the influence of the SEGM over their crime, and Detective Garafola's police report describing Abdur'Rahman's self-destructive behavior at the time of his arrest.

"[T]he suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment."

*Bell v. Bell*, 512 F.3d 223, 231 (6th Cir. 2008) (en banc) (quoting *Brady*, 373 U.S. at 87). A successful *Brady* claim requires the defendant to demonstrate that: (1) the evidence in question was favorable to him; (2) the prosecution suppressed the relevant evidence, either purposefully or inadvertently; and (3) the state's actions resulted in prejudice. *Id.* (citing *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999)). This rule applies to evidence that is exculpatory in nature as well as evidence that a defendant could use to impeach a government witness. *See United States v. Bagley*, 473 U.S. 667, 676–77 (1985).

### 1. Miller's Pre-Trial Statements about the SEGM

Abdur'Rahman's first *Brady* claim concerns pre-trial statements that Miller made to the prosecution concerning the SEGM's role in his murder of Daniels. No contemporaneous record of these statements exists. Rather, Ross Alderman, Miller's state trial counsel, testified that Miller made pre-trial statements to the prosecution that conflicted with his eventual testimony at Abdur'Rahman's trial. Abdur'Rahman derives the substance of Miller's pre-trial statements from Miller's testimony at a post-conviction hearing and at Miller's sentencing hearing, and alleges that Miller said the following:

(1) The purpose of the SEGM was to rid the community of drug dealers; (2) the "sole" purpose of going to Daniels's apartment was to effect the SEGM's plan to stop drug dealing in the community; (3) William Beard, a leader within the SEGM, provided Miller with the pistol he used to rob Daniels, and Abdur'Rahman said he had obtained the shotgun used in the crime from Alan Boyd; (4) Abdur'Rahman made a phone call after the offense, and Boyd arrived at Miller's apartment a short time later; (5) Miller overheard a conversation between Boyd and Abdur'Rahman at his apartment after the offense in which Boyd told Abdur'Rahman something like "just be cool, go back to work"; and (6) Beard gave Miller money before he fled the state, and Miller misled Beard about his getaway because he feared what Boyd and Beard might do.

Abdur'Rahman argues that the district court erred because the prosecution never informed him before sentencing that Miller made these statements. At trial, Miller stated that the robbery was Abdur'Rahman's idea and was committed for the purpose of

stealing drugs.  At the sentencing phase of the trial, Abdur'Rahman explained that he was influenced by the SEGM to rob Daniels, but the prosecution called this explanation "bunk."  Abdur'Rahman argues that Miller's pre-trial statements could have been used at the sentencing phase not only to corroborate his own testimony that the SEGM influenced him to go to Daniels's apartment and attempt the robbery, but also to discredit Miller's testimony that Abdur'Rahman masterminded the crime.[2]

Because, at the time of the trial, Abdur'Rahman knew about the SEGM and knew that Miller had discussed the SEGM with the prosecution before trial, the district court correctly held that withholding Miller's pre-trial statements did not violate *Brady*.  The *Brady* rule "only applies to evidence that was known to the prosecution, but unknown to the defense, at the time of trial."  *Apanovitch v. Houk*, 466 F.3d 460, 474 (6th Cir. 2006).  "No *Brady* violation exists where a defendant knew or should have known the essential facts permitting him to take advantage of any exculpatory information," *United States v. Clark*, 928 F.2d 733, 738 (6th Cir. 1991) (per curiam) (internal citations and quotation marks omitted), and this principle applies equally in the impeachment context, *see Byrd v. Collins*, 209 F.3d 486, 517 (6th Cir. 2000).  Where the defense is provided with enough information to enable counsel to impeach a witness, withholding that witness's statements does not violate *Brady*.  *Id.*  Ultimately, where the alleged *Brady* evidence is available to the defense, "there is really nothing for the government to disclose."  *Bell*, 512 F.3d at 235 (quoting *Coe v. Bell*, 161 F.3d 320, 344 (6th Cir. 1998)).

Here, Abdur'Rahman knew the essential facts reflected in Miller's pre-trial statements before the sentencing phase.  In fact, Abdur'Rahman's testimony repeated the substance of Miller's pre-trial statements, and Abdur'Rahman decided not to call Miller as a witness for this very reason.  Abdur'Rahman testified that he and Miller were both members of the SEGM, that its purpose was to rid the black community of drug dealers, and that Beard and Boyd were leaders within the SEGM.  *Abdur'Rahman*, 2009 WL

---

[2]As the warden notes, Abdur'Rahman argued in his petition for a writ of habeas corpus that the prosecution's suppression of Miller's statements was wrongful only because the statements contained exculpatory information.  Abdur'Rahman did not argue that the statements would have impeached Miller's trial testimony.  While Abdur'Rahman may have waived this particular argument for purposes of appeal, *see Barker v. Shalala*, 40 F.3d 789, 793–94 (6th Cir. 1994), we nevertheless consider it here.

211133, at \*7. He also testified that Boyd and Beard provided the weapons used during the offense, and that Boyd helped Miller escape afterwards. *Id.; see Abdur'Rahman*, 226 F.3d at 699. Abdur'Rahman did not testify that the SEGM's mission was the "sole" motive for the crime—in fact, he contradicted this, denying that the SEGM had turned him into a murderer or that other members of the SEGM were involved in the crime. *Id.* But his testimony did reveal that the SEGM provided some influence. He stated that members of the SEGM had explained how to confront drug dealers and suggested that they might be blackmailed for money. *Id.* Because Abdur'Rahman already knew of the exculpatory information in Miller's statements, there was little remaining for the prosecution to disclose.

Nor does the impeachment value of Miller's pre-trial statements require that we reverse the district court's holding. Abdur'Rahman argues that the ultimate value of the withheld statements is not what was said, but rather that Miller said them. Abdur'Rahman, however, knew that Miller had discussed the SEGM with the prosecution before trial. Abdur'Rahman's trial counsel wrote a letter to the prosecution before the sentencing phase, acknowledging that Miller "ha[d] advised your office of the existence of [the SEGM]." The prosecution confirmed Abdur'Rahman's understanding, stating that it had learned about the SEGM through its conversations with Miller. Given what Abdur'Rahman already knew about the SEGM and its influence, the prosecution's acknowledgment that Miller discussed the SEGM with it before trial provided Abdur'Rahman sufficient information to enable him to impeach the credibility of Miller's testimony at trial. Abdur'Rahman's decision not to do so was not the fault of the prosecution. *See Byrd*, 209 F.3d at 517. Accordingly, the district court did not err in concluding that the prosecution's nondisclosure of Miller's pre-trial statements did not violate *Brady*.[3]

---

[3] The dissent suggests our analysis on this point is flawed because we erroneously presume Abdur'Rahman's trial counsel was competent. While we did acknowledge Abdur'Rahman's counsel was ineffective in failing to investigate his background and mental health history, *see Abdur'Rahman*, 226 F.3d at 708, this does not compel that we presume his counsel was also ineffective in failing to discover the details of Miller's testimony or to cross-examine him about it.

## 2. *Abdur'Rahman's Head Banging upon Arrest*

Abdur'Rahman's second *Brady* claim concerns Detective Garafola's report detailing his conduct upon arrest. On February 19, 1986, when Abdur'Rahman was arrested for murdering Daniels, Detective Garafola authored a report that read, in part:

> When we returned to our office Det Elmore and myself attempted to interview [Abdur'Rahman]. He was in an interview room and when we entered the room [Abdur'Rahman] was crying. He would not respond to our questions. The only statement he made was "I only killed one man in my life and that was because he was trying to fuck me." He then started to hit his head on the table and then he jumped up still handcuffed to the chair and banged his head up against the wall. We got him under control and then took him to the booking room. In the booking room he started to bang his head on the wall again. Det Elmore was able to control him. We took Polaroid pictures of him and also mug shots with his glasses on and off.

The government concedes that this portion of Detective Garafola's report was redacted and not shown to Abdur'Rahman at trial or before sentencing. Abdur'Rahman argues that this report could have been used to show that he was "seriously mentally ill when he was arrested" and that he had been mentally ill for decades. He also argues this evidence would have demonstrated that he was particularly susceptible to manipulation by the SEGM, disproving the prosecution's characterization of him as a depraved killer. The mitigative effect of Detective Garafola's report, he argues, would have caused one or more jurors to vote in favor of a life sentence.

As an initial matter, we are not convinced that, at the time of the sentencing phase, Abdur'Rahman did not know the essential facts of the behavior described in Detective Garafola's report. Although it is possible that Abdur'Rahman was not personally aware of his own head-banging, his trial counsel indicated that "something happened at the time [Abdur'Rahman] was arrested and he might have been put in a padded cell if he maybe lost his temper or something of that nature." Trial counsel interviewed Detective Garafola and "talked about what happened at the point of arrest." Moreover, a Davidson County Sheriff's Department incident report indicated that, four hours after his interview with Detective Garafola, "[Abdur'Rahman] started beating his

head against the floor." Abdur'Rahman has never claimed that this report was suppressed; apparently, however, his trial counsel apparently never took steps to obtain it. If Abdur'Rahman's counsel did not know the essential facts of Abdur'Rahman's head-banging as described by Detective Garafola, he likely should have discovered them through further investigation.

Because the prosecution's suppression of this part of Detective Garafola's report does not undermine our confidence in Abdur'Rahman's sentence, the district court did not err in rejecting the second *Brady* claim. A failure to disclose evidence favorable to the defense is "'material,' and therefore 'prejudicial,' only 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Apanovitch*, 466 F.3d at 475 (quoting *Strickler*, 527 U.S. at 280). This "reasonable probability" exists when the government's suppression of evidence undermines confidence in the outcome of the trial. *Id.* (citing *Kyles v. Whitley*, 514 U.S. 419, 434 (1995)). Here, because Tennessee's capital sentencing law requires a unanimous jury vote to impose a death sentence, *see* Tenn. Code Ann. § 39-2-203(h) (1983), the relevant inquiry is "whether there is a reasonable probability that the withheld evidence would have altered at least one juror's assessment of the appropriate penalty for [Abdur'Rahman's] crime," *Cone v. Bell*, 556 U.S. ---, ---, 129 S. Ct. 1769, 1773 (2009).

To determine whether the nondisclosure of Detective Garafola's report was material, Abdur'Rahman urges us to also consider the prejudice arising from his first *Brady* claim along with that arising from "the prosecutor's further misconduct"—in particular, the presentation of his "prejudicial" indictments at sentencing and the suppression of a transcript from his 1972 murder trial. His request is overbroad. When granting a COA in this case, we "permitted [Abdur'Rahman] to make cumulative-effect arguments with respect to the subclaims on which [the COA was granted], even it if involves referring to the factual allegations that underpin prosecutorial-misconduct subclaims on which [the COA was denied]." In so stating, we merely acknowledged the well-established rule that, when considering the materiality of alleged *Brady* evidence,

we consider the cumulative effect of all of the undisclosed evidence, rather than each item in isolation. *See Doan v. Carter*, 548 F.3d 449, 460 (6th Cir. 2008) (citing *Kyles*, 514 U.S. at 436). Accordingly, our cumulative effect analysis looks only to other evidence that was both suppressed and exculpatory. *Cf. Smith v. Sec'y, Dep't of Corr.*, 572 F.3d 1327, 1348 (11th Cir. 2009) (cumulating the effect of only those *Brady* claims "that do involve *favorable evidence that was actually suppressed*") (emphasis added). Because *Brady* does not apply to Miller's pre-trial statements, as they were not "undisclosed," we will not consider their potential impact when determining the materiality of the redacted portion of Detective Garafola's report. Given that we did not grant a COA on Abdur'Rahman's other claims, and therefore do not review the merits of those claims here, the only evidence that we may consider for cumulative effect is the 1972 murder trial transcript. *See Abdur'Rahman*, 999 F. Supp. at 1089–90 (holding that 1972 murder trial transcript was suppressed and exculpatory, but not material).

In analyzing materiality, we begin by looking at any prejudice arising from the suppression of part of Detective Garafola's report. Had it been admitted in its entirety, it would have done little to establish Abdur'Rahman's mental illness at the time of the offense or before. Abdur'Rahman was evaluated at the time of trial and found not to be incompetent or insane. As evidence of mental illness, Detective Garafola's report is far from conclusive. Head banging like Abdur'Rahman's could be a manifestation of many things (including frustration, anger, sadness, or mental illness) and therefore, in and of itself, is hardly dispositive of mental illness. Placing Abdur'Rahman in a padded cell is no more conclusive, and only represents the decision of law enforcement, not a mental health expert, that Abdur'Rahman was a potential danger to himself. The only other corroborating evidence of mental illness that Abdur'Rahman presented at sentencing was the testimony of himself and his wife. The addition of Detective Garafola's report adds little to Abdur'Rahman's narrative that he was mentally ill, and had it been presented, the prosecution could have rebutted it with considerable expert testimony to the contrary.

Nor would admission of Detective Garafola's report have disproved the prosecution's narrative characterizing Abdur'Rahman as a depraved killer.

Abdur'Rahman's head banging, under the circumstances described above, does not contradict the prosecution's description of Abdur'Rahman as "not someone suffering from several emotional disturbance." Further, because Abdur'Rahman testified to the contrary at his sentencing phase, Detective Garafola's report does little to establish that Abdur'Rahman was susceptible to manipulation by the SEGM. Abdur'Rahman testified that the SEGM did not turn him into a murderer, and that Beard and Boyd were not involved in the crime. *Abdur'Rahman*, 2009 WL 211133, at *7. It is not likely that Detective Garafola's report would have changed the jury's impression of Abdur'Rahman.

In fact, based on Detective Garafola's report alone, the jury could just as easily have viewed Abdur'Rahman's head banging as evidence of his culpability rather than as mitigation. Abdur'Rahman had already been convicted of a prior murder at the time of his arrest and was now accused of stabbing another man to death. Once in custody, Abdur'Rahman surely knew that he faced either a death sentence or life in prison. Rather than mental illness, then, the jury could have viewed Abdur'Rahman's head banging as evidence of guilt, distress or frustration that underscored the danger he posed to himself and to others. As a result, while the redacted portion of Detective Garafola's report might have been favorable to Abdur'Rahman, it is highly unlikely that its admission at sentencing would have caused any juror to alter his assessment that Abdur'Rahman deserved the death penalty.

Our conclusion remains unchanged, even when considering materiality in light of any prejudice arising from the suppression of the 1972 murder trial transcript. As the district court noted in an earlier phase of Abdur'Rahman's habeas proceedings, any prejudice arising from the suppression of that evidence was immaterial. *See Abdur'Rahman*, 999 F. Supp. at 1089–90. When that item is considered together with the redacted portions of Detective Garafola's report, the prospect of prejudice is no more convincing. Although both items allegedly relate to Abdur'Rahman's mental health history, neither is especially strong evidence, and the combined effect of them by no means tends to "put the whole case in a different light as to undermine confidence in the

verdict." *See Cone*, 129 S. Ct. at 1783 (internal quotation marks omitted); *cf. Poindexter v. Mitchell*, 454 F.3d 564, 573 (6th Cir. 2006) ("[W]here one is left with pure speculation on whether the outcome of the trial could have been any different, there is an insufficient showing of prejudice[.]" (internal quotation marks, citation, and alteration in original omitted).

**AFFIRMED**.

---

**DISSENT**

---

COLE, Circuit Judge, dissenting.  This saga appears to be drawing to an unjust close.  Eleven years ago we reviewed Abdur'Rahman's ineffective assistance of counsel claim after the district court found it meritorious and granted Abdur'Rahman a new penalty-phase trial.  *See Abdur'Rahman v. Bell* (*Abdur'Rahman I*), 999 F. Supp. 1073 (M.D. Tenn. 1998), *aff'd in part and rev'd in part by Abdur'Rahman v. Bell* (*Abdur'Rahman II*), 226 F.3d 696 (6th Cir. 2000).  I agreed with the district court's conclusion then because I believed, as I still do now, that had Abdur'Rahman's lawyer unearthed the breathtaking deprivations and serious mental impairments that shaped Abdur'Rahman and used those events and disabilities to paint a human portrait, at least one penalty-phase juror would have voted to spare his life.

My colleagues disagreed.  While leaving undisturbed the district court's finding that counsel performed deficiently, they undid its prejudice determination—even though the Warden had never quarreled with it.  *See Abdur'Rahman II*, 226 F.3d at 708-09.  Deploying the familiar logic of the double-edged sword, the majority obliterated in a few sentences the mitigating value of Abdur'Rahman's horrific upbringing—the worst case of abuse the testifying psychologist had seen in twenty-five years of practice—and litany of psychotic disorders, with the spectre of his prior violent acts.  *Id.*  They reasoned vaguely that the evidence cut both ways because it "contained a description of Petitioner's motive for killing a fellow prison inmate and a history of violent character traits."  *Id.* at 709.  No matter that competent counsel would have persuasively framed these prior acts as symptomatic of Abdur'Rahman's schizoid personality, and then integrated them into a nuanced depiction of Abdur'Rahman worthy of a juror's mercy.

The majority's prejudice analysis was wrong then and it has aged poorly.  In *Rompilla v. Beard*, 545 U.S. 374 (2005), a case where the petitioner had a similar history of prior violent acts  and suffered from a comparable degree of abuse and psychological impairment, the Supreme Court held the petitioner was prejudiced by the failure to

present these forms of mitigating evidence, because a defense including such facts would have borne "no relation to the few naked pleas for mercy actually put before the jury." *Id*. at 393. And, in another case where the petitioner endured an atrocious upbringing and had a prior history of violence, a unanimous Court granted the writ after rejecting as objectively unreasonable the Florida Supreme Court's prejudice determination. *Porter v. McCollum*, ___ U.S. ___, 130 S. Ct. 447, 448 (2009) (per curiam). Indeed, the Court reached this conclusion even though Porter offered in mitigation that he was not "mentally healthy," and Porter's ex-wife testified that Porter had a good relationship with his son. *Id*. at 449. Still, the Court found prejudice under AEDPA because "[t]he judge and jury . . . heard almost nothing that would humanize Porter or allow them to accurately gauge his moral culpability." *Id.* at 454. Abdur'Rahman's trial was constitutionally deficient for the same reasons. *See Abdur'Rahman II*, 226 F.3d at 719-24 (Cole, J., concurring in part and dissenting in part).

This would all be water under the bridge if the majority's *Brady* analysis did not ironically presume that Abdur'Rahman's counsel was competent. But the fiction that the defense had the time and aptitude to discover what the prosecution had a constitutional obligation to provide underpins the majority's dismissal of the exculpatory evidence at issue in the instant petition. With respect to the Garafola report, the majority washes its hands of the prosecution's deliberate withholding of this evidence by insisting that Abdur'Rahman's counsel knew the fuzzy contours of the report and that through investigation he "should have discovered," Maj. Op. at 10, the essential facts that it contained. For the same reason, the majority dismisses compelling evidence from Devalle Miller's own mouth that he lied on the stand. *See* Maj. Op. at 8-9.

The majority's conclusion that this evidence—proving that the government's star witness lied under oath and depicting Abdur'Rahman's mental deficiency—falls outside *Brady*'s scope confounds me. The rationale offered is tenuous. The proposition that Abdur'Rahman's testimony could substitute for the impeachment evidence because it too could be used to contradict Miller, or that, with the magic of cross-examination, Abdur'Rahman's counsel could have forced Miller to confess the truth, reflects a poor

understanding of the mechanics of trial. The notion that Abdur'Rahman's counsel should have discovered the facts contained in the Garafola report presumes a competence that, as mentioned above, our prior deficient performance holding belies. *See Abdur'Rahman II*, 226 F.3d at 707-09 (leaving undisturbed the district court's deficient performance finding).

Still, these findings are of a piece with other significant decisions the majority has made in this case over the years: declining to find that Abdur'Rahman's counsel's performance prejudiced him, though the state never argued this point; refusing to cumulate all evidence of prosecutorial misconduct in the instant appeal, though the Certificate of Appealability ("COA") permits it, the Supreme Court requires it, *see Kyles v. Whitley*, 514 U.S. 419, 436 (1995), and all the constituent claims were exhausted; and forbidding Abdur'Rahman even to proceed on the instant claims pursuant to Federal Rule of Civil Procedure 60(b) after a remand from the Supreme Court. *See Abdur'Rahman v. Bell*, 493 F.3d 738 (6th Cir. 2007) (vacated en banc Oct. 19, 2007). To be sure, the majority has put forth support for its positions, as I have for mine; but viewed at a distance a pattern emerges, and it reveals that the majority's animating concern—even in this *pre*-AEDPA case—has not been to ensure that a conviction was had without constitutional error, but to efface in the name of federalism, finality, and comity any errors that were present.

Getting there is easier than you think. It merely requires a ceaseless commitment to privilege formalism over every other legal value; nowhere is that simpler to do than in the thicket of the Great Writ. If we chop claims into enough pieces and deal with each in a way that is perfectly abstracted from the reality of the death-penalty courtroom, all the errors vanish. The spell does break eventually, when someone looks hard enough to see past the sleight of hand. Whether the revelation will come to a person with the authority to spare Abdur'Rahman, and in time, I do not know.

### I. Brady Claims

A fair look at the suppressed *Brady* evidence, in the context of the penalty-phase trial that actually took place, undermines confidence in the verdict and demands issuance of the writ.  The central issue there was whether Abdur'Rahman's life should be spared because he was mentally disturbed.  His psychological instabilities explained why he was susceptible to the Southeastern Gospel Ministry's quasi-religious and militaristic message and why he erupted into the uncontrolled violence that resulted in Daniels's death.  The prosecution rejected this view out of hand, calling it "bunk,"(Penalty-Phase Tr., App'x at 727), and insisting to the jury that Abdur'Rahman was not impaired in the slightest.  Through the prosecutor's lens, the jury saw Abdur'Rahman as a base and depraved killer, in control of his actions, and who had killed wantonly before, in 1972.

To be clear, the prosecutor is *required* to do battle forcefully.  But there are limits.  The Constitution forbade him from fixing the fight by withholding every scrap of evidence that undermined the state's case or would have allowed the jury to see Abdur'Rahman's actions in a more sympathetic light.  The prosecutor knew that Abdur'Rahman had raised insanity as a defense to the 1972 killing, but rather than comply with his ethical and constitutional obligations and disclose the transcript of that proceeding to the defense, the prosecutor *lied* to defense counsel, telling him that no evidence mitigated Abdur'Rahman's prior crime, and (the more pernicious invention) that it was committed in furtherance of a drug turf-war.  The drug-turf-war fabrication devastated the defense, and the fallout entailed much more than the missed opportunity to present the suppressed evidence.

Stretched thin by a crushing caseload, defense counsel ran triage on Abdur'Rahman's trial, *see* Mark Curriden, *A Life in the Balance*, A.B.A. J., Mar. 2011, at 47; his harried state and the rapport he felt with the prosecutor (they had opposed each other in several prior cases) explain why the prosecutor's lies were so terribly successful. (*See* Zimmerman Post-Conviction Dep., App'x at 415-22 (admitting he aimed to prevent defense counsel from "getting into . . . the 1972 murder")); Curriden, *supra*, at 51. Making up a false motive for the prior crime that was consistent with the prosecution's

theory of the instant one (drug-related robbery) had two mutually reinforcing effects: it (1) bolstered the trustworthiness of the prosecutor's core misrepresentation that no evidence mitigated the prior assault, and (2) left defense counsel with the intimidating impression that there might be something real in the prosecution's view of Abdur'Rahman's moral culpability. Each of these, working in tandem with defense counsel's trust in the prosecution, allowed Abdur'Rahman's unprepared and overworked defense counsel to feel the false security that proceeding with his ad hoc trial strategy and an underdeveloped record would not cause his client harm.

The lie inflicted damage at another level because the prosecutor parroted it to the professional mental health evaluators at the Middle Tennessee Mental Health Institute who analyzed Abdur'Rahman's mental state. (*See* Zimmerman Letter to MTMHI, App'x at 268-69.) It is hard to see how the professionals there could correctly assess the health of Abdur'Rahman's mind without knowledge of his prior psychosis. So this single deception created a cascade nullifying every legal and administrative safeguard meant to ensure that the existence of Abdur'Rahman's mental deficits reached the jury. A verdict resulting from a falsehood this disruptive cannot command confidence.

The prosecution's mayhem continued with the suppression of the Garafola Report; its depiction of Abdur'Rahman banging his head against every surface of the police interrogation room would leave any reader with the impression that he was seriously disturbed. Armed with this evidence, defense counsel not only would have put on a more persuasive mitigation case to the jury, he also would have received a signal—in neon lights—urging him to delve further into Abdur'Rahman's background. And the report would have prodded defense counsel to seriously doubt the prosecutor's representations regarding the 1972 assault, as it quotes Abdur'Rahman saying "I only killed one man in my life and that was because he was trying to fuck me." (Garafola Report, App'x at 173-75.)

Had defense counsel then inquired into the veracity of that statement, he would have discovered that Abdur'Rahman was involved in a trio of coercive and violent sexual relationships with other inmates in 1972, (*see* Elmer Bishop Dep., App'x at 617-

18), and that the man he stabbed in 1972, Michael Stein, was a sexual "predator" who "preyed on . . . younger, weaker inmates [, like Abdur'Rahman,] for sex." (*Id*. at 624.) Furthermore, when Stein's mother sued the prison for wrongful death under the Federal Tort Claims Act, the government took the position, based on an FBI investigation, that Stein "was a member of a group of inmates who were attempting to apply extortionate pressures on [Abdur'Rahman] to submit to Stein's demands for homosexual activities. The assault . . . [on Stein] arose out of an attempted assault on [Abdur'Rahman] approximately two weeks earlier by members of this group." (*Id.* at 627-28.) The absence of this evidence depicting an abused man lacking normal psychological brakes, and the compounding, down-the-line, effects of that omission on an overtaxed defense counsel, prejudiced Abdur'Rahman.

There is more. Testifying for the prosecution, Devalle Miller sold the lie that sent Abdur'Rahman down the river. Instead of telling the jury what Miller told the prosecutors, that he and Abdur'Rahman went to Daniels's home to further the mission of the SEGM to stop drug dealing in the community, and that both he and Abdur'Rahman were given weapons for that purpose by the charismatic leaders of the group, William Beard and Allen Boyd, Miller recited a motive that dovetailed with the prosecution's case for death. In this alternative reality, Abdur'Rahman was the intimidating figure who compelled Miller to go to Daniels's house and rob him—end of story. Miller left out that he had lied to Beard about where he would go into hiding because Miller was afraid that Beard, Boyd and other SEGM leaders might kill him, a precaution difficult to square with the notion that Abdur'Rahman alone pulled the strings. From these facts the jury might readily have concluded that Abdur'Rahman was similarly intimidated by the SEGM leadership. Had defense counsel known that Miller had told the prosecution something entirely different, the defense would have nullified Miller's testimony and provided more evidence that Abdur'Rahman was fertile ground for the SEGM's misguided message.

Lastly, on top of secreting away exculpatory evidence, the prosecutor had the gall to taint the jury by showing them indictments from Abdur'Rahman's prior crimes, in

direct contravention of the trial court's order and the prosecutor's agreement. Those indictments revealed more than the admissible fact of the prior conviction, they also showed a separate robbery charge which never yielded a conviction. Though the jury was instructed by the trial court to disregard this improper evidence, the prejudicial effect of the indictments could not so easily be undone. Thus, through means that the Tennessee Court of Appeals found "bordered on deception" and "improper," the prosecution received yet another affirmation of its view of Abdur'Rahman's character, one which tracked precisely the prosecution's theory of the crime of conviction—a depraved murder/robbery with no mitigating qualities. *State v. Jones* (*Abdur'Rahman*), 789 S.W.2d 545, 552 (Tenn. 1990).

How to make sense of these discrete but mutually-reinforcing acts of malfeasance? The Supreme Court has emphasized that *Brady* "omission[s] must be evaluated in the context of the entire record," *United States v. Agurs*, 427 U.S. 97, 112 (1976), and then, "collectively, not item by item." *Kyles*, 514 U.S. at 436. This is so because "[t]he proper standard of materiality must reflect our overriding concern with the justice of the finding of guilt." *Agurs*, 427 U.S. at 112. That focus requires us to consider whether withheld evidence would have "rebutted" the prosecution's arguments, *Cone v. Bell*, ___ U.S. ___, 129 S. Ct. 1769, 1786 (2009), shown them to be "false and misleading," *id.*, or "len[t] support" to the petitioner's case for life, *id.* at 1784. The evidence suppressed here would have had all those effects. Miller's prior inconsistent testimony undercuts dramatically the persuasive value of the prosecution's case for death by showing that the testimony of its key witness was false and misleading. *See id.* at 1783-86 (describing how the *Brady* evidence substantially enhanced the case for life and diminished that for death). The transcript from Abdur'Rahman's 1972 assault trial along with the Garafola Report lends support to the case for life by strengthening the inference that Abdur'Rahman was mentally disturbed. Showing the jury the prejudicial indictments improperly biased it against the defense. The sum of these parts invalidates the verdict. At least one juror could reasonably be predicted to see the case in a different light and vote for life after considering all the withheld evidence in mitigation and the

detrimental effect that evidence would have had on the prosecution's case for death. *See id.*; *Kyles*, 514 U.S. at 435.

The majority's refusal to conduct this cumulative *Brady* analysis with the claims on which the court denied a stand-alone COA (the 1972 transcript and the prejudicial indictments) has no support in the case law or the instant COA. *Smith v. Secretary, Department of Corrections*, 572 F.3d 1327, 1347 (11th Cir. 2009), did hold, as the majority contends, that procedurally barred individual claims may not be cumulated, but none of the claims Abdur'Rahman knits together was defaulted; all of them were raised and exhausted over the long course of this litigation. Moreover, the COA plainly contemplates a cumulative analysis of the prosecutorial-misconduct claims. (*See* Jan. 20, 2010 Order at 5 ("Abdur'Rahman is permitted to make cumulative-effect arguments with respect to the subclaims on which we grant him a COA, even if it involves referring to factual allegations that underpin prosecutorial misconduct subclaims on which we have denied his COA request.").) Finally, the Warden waived any challenge to the inclusion of that material in the cumulative effect calculus. There is no support in the law or the record for the majority's dodge.

## II.  Brady/Strickland Claim

Abdur'Rahman mounts a final attack by banding together the *Brady* violations with his long-settled *Strickland* claims. *See Abdur'Rahman II*, 226 F.3d at 707-09. I agree with Abdur'Rahman that the COA creates no jurisdictional bar to our review of this hybrid claim because the COA allows Abdur'Rahman to make cumulative effect arguments related to his *Brady* subclaims. (*See* Jan. 20, 2010 Order at 5 ("Abdur'Rahman is permitted to make cumulative-effect arguments with respect to the subclaims on which we grant him a COA.").) The clause the majority reads to limit the scope of those cumulative claims ("even if [bringing cumulative claims] involves referring to factual allegations that underpin prosecutorial misconduct subclaims on which we have denied his COA request") is properly read to provide an example of one kind of cumulative effect claim, not to limit the permutations of permissible *Brady* hybrids. (*Id.*) Even so, I am constrained to agree with the majority that Abdur'Rahman

procedurally defaulted the *Strickland/Brady* claim by failing to raise it in state court. *See Keith v. Mitchell*, 455 F.3d 662, 679 (6th Cir. 2006) (citing *Lorraine v. Coyle*, 291 F.3d 416, 447 (6th Cir. 2002)).

Were I able to reach this last claim, I would grant it for the reasons detailed above. The *Brady* violations and *Strickland* ineffective assistance fed off each other at trial in a perverse symbiosis that infected the verdict with constitutional error. Perhaps if Abdur'Rahman could have pursued his petition in another circuit his life might be spared in this procedural posture. *See, e.g.*, *Derden v. McNeel*, 978 F.2d 1453, 1456-57 (5th Cir. 1992) (permitting a hybrid cumulative error argument where none was raised below). But I am powerless against our precedent and my colleagues' contrary views.

### III. Conclusion

A parting thought. Whatever your take on the merits of Abdur'Rahman's claims, one thing about this case is undeniable: the prosecutor desecrated his noble role. He failed grossly in his duty to act as "the representative . . . of a sovereignty . . . whose interest . . . in a criminal prosecution is not that it shall win a case, but that justice shall be done." *Berger v. United States*, 295 U.S. 78, 88 (1935). Abdur'Rahman may face the ultimate penalty as a result; Justice will bear a scar.

I dissent.