IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
January 6, 2015 Session

**STATE OF TENNESSEE v. RICO VALES**

**Appeal from the Criminal Court for Shelby County**
**No. 12-01881      Carolyn Wade Blackett, Judge**

_____

**No. W2014-00048-CCA-R3-CD  -  Filed March 9, 2015**

_____

Appellant, Rico Vales, stands convicted of two counts of aggravated assault, Class C felonies, and being a felon in possession of a handgun, a Class E felony.  He received concurrent sentences of fifteen years for each aggravated assault conviction and six years for the handgun conviction.  Appellant raises two issues for our review: (1) whether the evidence was sufficient to support his conviction of aggravated assault against one of the victims and (2) whether his right to a trial by an impartial jury was violated by pre-trial contact between a juror and one of his witnesses and the prior acquaintance of the juror and that witness.  Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROGER A. PAGE, J., delivered the opinion of the court, in which ALAN E. GLENN and CAMILLE R. MCMULLEN, JJ., joined.

Robert Brooks (on appeal), and William D. Massey (at trial), Memphis, Tennessee, for the appellant, Rico Vales.

Herbert H. Slatery III, Attorney General and Reporter; Tracy L. Alcock, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Katherine Berendt Ratton, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

This case arises from a confrontation at a Memorial Day barbeque that ultimately ended in appellant's standing in the street and shooting toward the victims who were in and beside a truck.

I. Facts

The State's first witness was Ammon Brookins,[1] one of the victims in this case. Ammon attended a Memorial Day barbeque at the home of his father and step-mother on May 30, 2011. He described the gathering as "very festive," with games, barbeque, and liquor. Fifteen to twenty people were in attendance, including appellant, who was present with his fiancée, Muszette Davis, who was the sister of Ammon's step-mother. Ammon recalled that at some point, appellant mistakenly believed that Delester Quarles, a friend of Harold "Jessie" Brookins,[2] Ammon's father, was making advances toward Ms. Davis. Appellant attempted to engage Mr. Quarles in a fight, but Mr. Quarles remained in his chair, stayed calm, and would not react to appellant, which seemed to anger appellant further. Attendees at the gathering attempted to calm appellant, but he became even more angry. People began to leave the party because of the escalating situation. Appellant walked to his vehicle, a black Mercedes, and looked for something in the trunk. Ammon believed that the item for which appellant was searching was not in the trunk, which prompted appellant to leave the party. Ms. Davis did not leave with appellant at that time.

About two hours later, Mr. Quarles and Mr. Brookins were sitting in Mr. Quarles' truck across the street from the Brookins residence. Ammon walked over to tell Mr. Quarles that upon information he gleaned from Ms. Davis, Mr. Quarles may want to leave because appellant was on his way back to the residence and they did not want a confrontation. As he was talking to the men in the truck, appellant arrived in a black truck and parked in front of the Brookins residence. When he exited the vehicle, he had a gun in each hand. Ammon tried to warn the occupants of the truck, but they were engaged in arm wrestling and did not pay attention to his alert. Ammon backed away from the truck and put his hands in the air. He attempted to shield himself on the passenger side of the truck; the occupants still did not realize what was happening. By that time, appellant was standing at the driver's side door. Ammon stated that appellant was drunk and that he addressed Mr. Quarles, "If you're not scared, you're scared now." "Within maybe a minute," appellant started to fire a gun. Ammon felt "threatened" not only for himself, but for his father and the rest of his family in the house across the street.

Ammon recalled that when the gunfire began, he ran to a car that was parked in front of Mr. Quarles' truck to seek cover. He then heard Mr. Quarles start the truck's engine and drive away, but appellant began to fire even more. Appellant then left in his truck. Ammon immediately dialed 9-1-1. He noted seven shell casings in the street where the shooting had occurred. Subsequently, police asked Ammon to give a statement

---

[1] Because two of the witnesses have the same surname, we will refer to the younger Mr. Brookins by his first name, Ammon. By doing so, we mean no disrespect.

[2] Mr. Brookins passed away between the incident in question and the trial.

at the police department. While he was there, Ammon viewed a photographic line-up and identified appellant as the shooter.

On cross-examination, Ammon acknowledged that several people were playing cards at the party and that he lost money in a card game against appellant. However, he clarified that they were just playing for "change out of a coin purse." Ammon confirmed that his father had been drinking that night but denied that was why he could not give a statement to police at the time. Rather, Ammon explained that his father was too upset to give a statement. He said that Mr. Quarles had been drinking also but denied that either of the men was intoxicated.

The State's next witness was Delester Quarles, another victim in the case. He recalled that on May 30, 2011, people were "just sitting, . . . drinking a couple of beers, . . . just chilling" when appellant thought Mr. Quarles had "said something out of line . . . to his fiancé[e] or wife[,] . . . and it just escalated from there." Mr. Quarles apologized for anything he may have said that was offensive, but appellant remained "abrupt and threatening." The previously jovial mood changed as people tried to calm appellant. When appellant left the party, he told Mr. Quarles, "[D]on't be here when I get back." Mr. Quarles decided to take his dinner home with him, but as he entered his truck, Mr. Brookins followed him and sat with him in the truck where they talked and arm-wrestled.

Later, Ammon walked up to the truck, and as he was talking to the men, appellant pulled up in a truck. He recalled that appellant said "something" to him then pulled a gun from behind his back. As Mr. Quarles "hit the gas and . . . sped away" to "[t]ry[] not to get shot," he heard gunshots. Ammon called him thereafter to return to the scene, and after speaking with police officers, Mr. Quarles was arrested on a warrant for driving on a suspended license. While Mr. Quarles was in jail, he gave a statement about the events of May 30 and identified appellant in a photographic line-up as the shooter.

On cross-examination, Mr. Quarles acknowledged that some people were playing cards that day but stated that he was not involved in a card game. He stated that all of the festivities occurred outdoors and that he remained outdoors the entire time. He admitted that he had "a little bit" to drink that night but denied that he was intoxicated.

The State called Officer Jonathan Linton with the Memphis Police Department ("MPD") as its next witness. Officer Linton responded to the 9-1-1 call and spoke with Ammon when he first arrived on the scene. Ammon directed him to the area where appellant was standing when he fired the shots. There, Officer Linton recovered six nine millimeter shell casings, which he collected and secured as evidence. Subsequently, Officer Linton interviewed Mr. Quarles and Mr. Brookins, and he described the men as being "somewhat intoxicated." In contrast, he described Ammon as being "sober" and in his "right mind." After writing down the victims' pertinent information, Officer Linton

-3-

discovered that Mr. Quarles had an outstanding warrant, so Officer Linton arrested him. Officer Linton stated that after a responding officer "tags" all of the evidence, the case progresses to an investigator, who "follows up" with witness interviews, etc.

MPD Investigator Marcus Berryman, the State's next witness, testified that when he was assigned to this case, he first attempted to locate the victims. He reached Mr. Brookins by telephone and interviewed Mr. Quarles, who was still incarcerated, at the police department. Mr. Brookins refused to travel to the police station to give a statement, and Mr. Quarles "did not want to participate in [the] investigation very much." However, Ammon was "very interested in pursuing [the] investigation." He voluntarily gave a statement at the police station and identified appellant in a photographic line-up.

Investigator Berryman stated that he enlisted the assistance of the Investigative Services Unit ("ISU"), which was the department's "pick-up team." The ISU attempted to locate appellant on three different occasions spanning several days. Because appellant had already been positively identified by a victim, Investigator Berryman obtained a warrant for appellant's arrest. Upon this evidence, the State rested its case-in-chief.

Appellant called his fiancée, Muszette Davis, as his first witness. Ms. Davis's sister was married to Mr. Brookins. She testified on that Memorial Day 2011, she and appellant went to her sister's home for a barbeque. After they arrived, people began playing cards and mingling outside. She noted that appellant joined a card game at the "first" table where Ammon was also playing cards and that Ammon was drinking alcohol. At some point, appellant moved to the "second" table, and Ms. Davis sat at the first table. She then heard "some noise and arguing going on" and ascertained that appellant and Mr. Quarles were involved in a "verbal exchange." She said that Mr. Quarles appeared to be intoxicated. Ms. Davis said that she walked to appellant and asked what was going on, and he responded that Mr. Quarles was talking about her. Ms. Davis said that at her insistence, appellant left with her in their vehicle and that they went to a sports bar. She asserted that from that point until approximately 1:15 or 1:30 the following morning, appellant was with her the entire time and never returned to the Brookins residence. Ms. Davis said that when appellant learned that there was a warrant for his arrest, he turned himself in to law enforcement officers.

On cross-examination, Ms. Davis acknowledged that at the time of the incident, she and appellant owned a black Dodge Ram truck in addition to the black Mercedes but stated that no one drove the truck to the Brookins residence that day. Ms. Davis confirmed that she posted appellant's bond and that when he was released, he informed her that he had been arrested for aggravated assault. However, Ms. Davis could not remember the date of appellant's arrest, the date he turned himself in, or the date she posted his bond. She also did not recall what appellant told her about the aggravated assault.

-4-

Darryl White also testified for appellant and said that he was at the sports bar when appellant and Ms. Davis arrived around 6:15 p.m. on Memorial Day 2011. Mr. White asserted that he sat at a table with appellant and Ms. Davis and that appellant did not leave the bar at all until 2:00 or 2:15 a.m. the following day. He stated that at the time in question, he knew appellant owned a black "Infiniti" type car and a black truck.

On cross-examination, Mr. White acknowledged that when the prosecutor questioned him earlier in the week of trial, he thought the occasion that he described occurred on a Sunday. He said that he found out "three or four days later" that appellant had been arrested. Mr. White denied knowing Mr. Quarles or Ammon and denied speaking to Mr. Quarles or calling Ammon names outside of the courtroom during trial.

Appellant's last witness was Kenneth Jennings, who testified that he knew appellant from a bar "in the neighborhood." When Mr. Jennings arrived at the sports bar around 7:00 p.m. on Memorial Day 2011, he saw appellant and Ms. Davis, who were already there. He did not see appellant leave between 7:00 p.m. and 11:30 p.m. when Mr. Jennings left the bar. On cross-examination, Mr. Jennings acknowledged that he had been convicted of theft and had received a sentence of three years. Appellant then rested his case.

The jury convicted appellant of two counts of aggravated assault, and the trial court found him guilty of being a felon in possession of a handgun. The court sentenced him to fifteen years for each aggravated assault and six years for the weapon violation, all to be served concurrently with each other in the department of correction. After an unsuccessful motion for a new trial, this appeal follows.

## II. Analysis

Appellant raises two issues for our review: (1) whether the evidence was sufficient to support his conviction of aggravated assault against Mr. Quarles and (2) whether his right to a trial by an impartial jury was violated by pre-trial contact between a juror and one of his witnesses, Ms. Davis, and the prior acquaintance of the juror and Ms. Davis.

### A. Sufficiency of the Evidence

The standard for appellate review of a claim challenging the sufficiency of the State's evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (citing *Johnson v. Louisiana*, 406 U.S. 356, 362 (1972)); *see* Tenn. R. App. P. 13(e); *State v.*

*Davis*, 354 S.W.3d 718, 729 (Tenn. 2011). To obtain relief on a claim of insufficient evidence, appellant must demonstrate that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *See Jackson*, 443 U.S. at 319. This standard of review is identical whether the conviction is predicated on direct or circumstantial evidence, or a combination of both. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011); *State v. Brown*, 551 S.W.2d 329, 331 (Tenn. 1977).

On appellate review, "'we afford the prosecution the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences which may be drawn therefrom.'" *Davis*, 354 S.W.3d at 729 (quoting *State v. Majors*, 318 S.W.3d 850, 857 (Tenn. 2010)); *State v. Williams*, 657 S.W.2d 405, 410 (Tenn. 1983); *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). In a jury trial, questions involving the credibility of witnesses and the weight and value to be given the evidence, as well as all factual disputes raised by the evidence, are resolved by the jury as trier of fact. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). This court presumes that the jury has afforded the State all reasonable inferences from the evidence and resolved all conflicts in the testimony in favor of the State; as such, we will not substitute our own inferences drawn from the evidence for those drawn by the jury, nor will we re-weigh or re-evaluate the evidence. *Dorantes*, 331 S.W.3d at 379; *Cabbage*, 571 S.W.2d at 835; *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984). Because a jury conviction removes the presumption of innocence that appellant enjoyed at trial and replaces it with one of guilt at the appellate level, the burden of proof shifts from the State to the convicted appellant, who must demonstrate to this court that the evidence is insufficient to support the jury's findings. *Davis*, 354 S.W.3d at 729 (citing *State v. Sisk*, 343 S.W.3d 60, 65 (Tenn. 2011)).

As indicted in this case, to sustain a conviction for aggravated assault, the evidence presented by the State must have proven beyond a reasonable doubt that appellant "[i]ntentionally or knowingly cause[d] another to reasonably fear imminent bodily injury" by "the use or display of a deadly weapon." Tenn. Code Ann. §§ 39-13-101(a)(2), -102(a)(1)(A)(iii). Appellant argues that the State's evidence was insufficient to establish that Mr. Quarles reasonably feared imminent bodily injury.

"Aggravated assault based on fear requires the victim to have a 'well-grounded apprehension of personal injury or violence.'" *State v. Lonta Montrell Burress, Jr., and Darius Jerel Gustus*, No. E2013-01697-CCA-R3-CD, 2014 WL 6855226, at *8 (Tenn. Crim. App. Dec. 4, 2014) (citing *State v. Jones,* 789 S.W.2d 545, 550-51 (Tenn. 1990)), *no perm. app. filed*. "Circumstantial evidence is sufficient to establish a victim's fear of imminent bodily injury." *Id.* (citing *State v. Jessie James Austin,* No. W2001-00120-CCA-R3-CD, 2002 WL 32755555, at *5 (Tenn. Crim. App. Jan. 25, 2002)). "The element of 'fear' is satisfied if the circumstances of the incident, within reason and common experience, are of such a nature as to cause a person to reasonably fear

imminent bodily injury." *Id.* (quoting *State v. Gregory Whitfield,* No. 02C01-9706-CR-00226, 1998 WL 227776, at *2 (Tenn. Crim. App. May 8, 1998)). "A victim's fear may be inferred from circumstances surrounding the offense." *Id.* at *9. A jury can infer that a victim experienced reasonable fear even in the absence of direct testimony. *Id.*

In this case, the jury had before it sufficient evidence by which to infer that Mr. Quarles reasonably feared imminent bodily injury by use of a deadly weapon. Although Mr. Quarles remained calm during the initial confrontation, based upon appellant's admonition or threat that Mr. Quarles should not be there when appellant returned, Mr. Quarles immediately gathered his dinner and prepared to leave the area. His departure was postponed by Mr. Brookins, who sat with Mr. Quarles in his truck, where they talked and arm-wrestled. When appellant returned and Mr. Quarles perceived that appellant was wielding a gun, Mr. Quarles quickly stepped on the gas pedal and sped from the scene, "[t]rying not to get shot."

Mr. Quarles was aware that appellant was disgruntled with him based on their confrontation earlier in the day. Appellant threatened Mr. Quarles to leave the residence before he returned. Appellant returned in a different vehicle, wielding a weapon. As Mr. Quarles sped away, he heard shots. In the light most favorable to the State, a reasonable jury could have found that the circumstances of the incident were of such a nature to cause Mr. Quarles to reasonably fear imminent bodily injury by use of a deadly weapon. Appellant is not entitled to relief on this claim of error.

## B. Right to an Impartial Jury

Appellant argued, in his motion for a new trial, that his right to an impartial jury was compromised because Ms. Davis knew one of the potential jurors who was ultimately seated on the jury and had contact with her outside the courtroom during jury selection.[3]

At the hearing on the motion for a new trial, appellant called his fiancée, Muszette Davis, as his first witness. She testified that she was a witness at appellant's trial. During jury selection, she spoke with juror W.D. Ms. Davis said that she and appellant were standing outside of the courtroom when juror W.D. exited the courtroom, approached them, and asked how Ms. Davis had been. Ms. Davis described the encounter as "just a casual conversation" and responded that she was "doing fine." According to Ms. Davis, juror W.D. then asked what Ms. Davis was doing in the courthouse, and Ms. Davis answered that she was there for appellant's trial and told juror

---

[3] The record is unclear as to the exact stage of the jury selection process when this contact occurred. However, it does not appear from the record, and appellant has not argued, that the contact occurred after the jury was sworn.

W.D. that they were not supposed to have contact with each other.  Ms. Davis said that juror W.D. responded, "[D]on't worry about it because that's the reason why God put me here[,] to make everything okay."  Ms. Davis said that she introduced juror W.D. to appellant, and they continued to talk about their children until they moved away from each other.

On cross-examination, Ms. Davis acknowledged that she worked as a nurse at Pediatric Consultants and that her relationship with juror W.D. was professional in nature.  The only time she saw juror W.D. was when juror W.D. brought her children to the doctor, which had been "a couple of years."  She admitted that after trial, she located juror W.D.'s home address and visited her with the intention of securing her presence for the hearing on the motion for a new trial.  Ms. Davis confirmed that the address was correct because she saw juror W.D. standing in her doorway.  Rather than simply noting the address for appellant's attorney, however, Ms. Davis walked up to the front door and attempted to speak with her.  Juror W.D. did not wish to speak with Ms. Davis and asked her to leave.

Appellant also called juror W.D. as a witness.  She stated that she served on the jury that found appellant guilty.  She said that she knew Ms. Davis from the doctor's office where she had taken her two sons.  Juror W.D.'s younger son was twenty years old at the time of the hearing, and she estimated that she had not visited the doctor's office for approximately four years.  She had not seen Ms. Davis since that time until she saw her outside of the courtroom.  At that point, the jury had not yet been selected.  When she saw Ms. Davis, she said "hello" to her and asked how she had been doing.  Juror W.D. denied asking Ms. Davis why she was at the courthouse and denied that appellant was standing beside Ms. Davis or that Ms. Davis introduced them.  Juror W.D. told Ms. Davis, "'[W]hatever you're going through[,] I'm sure God will see you through.'"

Juror W.D. recalled the night that Ms. Davis appeared at her home and said that it was "really startling after seven months."  Juror W.D. had already entered her house when Ms. Davis knocked on the door.  When juror W.D. realized who was at her door, she told Ms. Davis that she needed "to get off of [her] property right now."  Juror W.D. testified that she was afraid for her life and for her family.  Juror W.D. confirmed that her professional relationship with Ms. Davis did not influence how she credited Ms. Davis's testimony and that she did not share the fact of their acquaintance with anyone else.

On cross-examination, juror W.D. stated that after Ms. Davis's testimony, she did not inform the bailiffs that she knew Ms. Davis.  She acknowledged that it "probably" would have been a good thing to do but that she "really didn't know what to do."  Juror W.D. said that "some of the statements Ms. Davis made about her as far as her fiancé being next to her . . . was false information" and that Ms. Davis "did not go into detail of why she was down here."  Juror W.D. said that when the judge released the two alternate

jurors, she did not bring this fact to the court's attention because she did not know what to do.

The trial court denied appellant's motion for a new trial, reasoning, "Based upon the court's hearing of the evidence, . . . based upon in particular the testimony of the juror that I've heard, which clearly, clearly conflicts with the testimony of Ms. [Davis], this court feels that the motion for a new trial at this time should be denied . . . ."

The court reprimanded defense counsel for calling a juror to testify, characterizing the act as "highly offensive that anyone would . . . harass a juror about something like that." It continued, "I'm not passing judgment one way or the other, but obviously, between the two testimonies, they're two clearly different stories as to what happened . . . But as far as the court's ruling is concerned, the motion for new trial will be denied . . . ."

The right to a trial by jury in both civil and criminal matters is a foundational right protected by both the United States Constitution amendments VI and VII and the Tennessee Constitution article I, sections 6 and 9. *State v. Smith*, 418 S.W.3d 38, 45 (Tenn. 2013). "The right to a jury trial envisions that all contested factual issues will be decided by jurors who are unbiased and impartial." *Id.* (citing *Ricketts v. Carter*, 918 S.W.2d 419, 421 (Tenn. 1996)). "An unbiased and impartial jury is one that begins the trial with an impartial frame of mind, that is influenced only by the competent evidence admitted during the trial, and that bases its verdict on that evidence." *Id.* (citing *Durham v. State*, 188 S.W.2d 555, 558 (1945)).

In this case, the jury was not sequestered. In *State v. Blackwell*, 664 S.W.2d 686 (Tenn. 1984), our supreme court discussed the procedure to be used when analyzing a juror issue with respect to a non-sequestered jury. The court held,

> We agree with the Court of Criminal Appeals that something more than a bare showing of a mingling with the general public is required where the jury is not sequestered to shift the burden of proof to the State of showing no prejudice. That additional requirement is that as a result of a juror's contact with a third person some extraneous prejudicial information, fact or opinion, was imported to one or more jurors or some outside improper influence was brought to bear on one or more jurors.

*State v. Perry*, 740 S.W.2d 723, 725 (Tenn. Crim. App. 1987) (citing *Blackwell*, 664 S.W.2d at 689); *see also* Tenn. R. Evid. 606 (limiting a juror's post-trial testimony to an inquiry as to "whether extraneous prejudicial information was improperly brought to the jury's attention[] [or] whether any outside influence was improperly brought to bear upon any juror").

In this case, there has been no such showing.[4] The evidence adduced at the hearing on appellant's motion for a new trial demonstrated that juror W.D. and Ms. Davis had, at best, a professional acquaintance and that Ms. Davis had not sought medical care for her son at Ms. Davis's place of employment for approximately four years. They briefly exchanged pleasantries outside of the courtroom, and juror W.D. denied that she met appellant or knew why Ms. Davis was outside the courtroom. Juror W.D. testified that her prior acquaintance with Ms. Davis did not influence how she credited Ms. Davis's testimony and that she did not share her relationship with any of the jurors. No testimony was presented that "extraneous prejudicial information, fact or opinion, was imported to one or more jurors or some outside improper influence was brought to bear on one or more jurors." *Id.* Appellant failed to meet the threshold showing that would have required the burden to shift to the State to demonstrate "no prejudice."

Appellant complains that the trial court failed to make a credibility determination in denying his motion for a new trial. We disagree. The trial court's statement that based upon the evidence, "*in particular the testimony of the juror that I've heard*, which clearly, clearly conflicts with the testimony of Ms. [Davis], this court feels that the motion for a new trial at this time should be denied," is sufficient for this court to conclude that the trial court properly made a finding of witness credibility. Appellant is without relief as to this issue.

## CONCLUSION

Based upon our review of the record, the briefs of the parties, the arguments of counsel, and the applicable legal authorities, we affirm the judgments of the trial court.

_____
ROGER A. PAGE, JUDGE

---

[4] Moreover, we note that appellant failed to include a transcript of *voir dire* in the appellate record. It is the duty of the appellant to prepare a record which conveys "a fair, accurate and complete account of what transpired with respect to the issues which form the basis of the appeal" and will enable the appellate court to determine the issues. Tenn. R. App. P. 24(a). Accordingly, we cannot conclude that the venire was informed of the names of all potential witnesses and questioned about their possible knowledge of them.