IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs November 20, 2019

**STATE OF TENNESSEE v. MARTY LYNN RAY**

**Appeal from the Criminal Court for Campbell County**
**No. 17,394          E. Shayne Sexton, Judge**

**No. E2019-00362-CCA-R3-CD**

The Defendant, Marty Lynn Ray, was convicted of four counts of rape of a child, a Class A felony, and sentenced to an effective ninety years in confinement. See Tenn. Code Ann. § 39-13-522. In this appeal as of right, the Defendant contends that the trial court erred by (1) denying his motion for a mistrial after the victim testified about a number of instances of sexual abuse exceeding the nine counts of the indictment; and (2) declining to dismiss a prospective juror for cause based upon her level of English proficiency. Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed.**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which THOMAS T. WOODALL and JAMES CURWOOD WITT, JR., JJ., joined.

Leif Ericson Jeffers, District Public Defender; and William C. Jones, Assistant Public Defender, for the appellant, Marty Lynn Ray.

Herbert H. Slatery III, Attorney General and Reporter; Nicholas W. Spangler, Senior Assistant Attorney General; Jared R. Effler, District Attorney General; and Lindsey C. Cadle and Meredith Slemp, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

FACTUAL BACKGROUND

## I. *Procedural History*

This case arises from the Defendant's sexually abusing S.B.,[1] his niece by marriage, when she was between six and eight years old.[2] S.B. reported the abuse in 2016, four years after the period specified in the indictment.

The July 2016 term of the Campbell County grand jury indicted the Defendant on thirty-three counts; Counts 20 through 33 named S.B. as the victim.[3] Relative to S.B., the Defendant was indicted on five counts of rape of a child; five counts of incest; and four counts of aggravated sexual battery. See Tenn. Code Ann. §§ 39-13-504, 13-522, -15-302. An amended indictment was filed renumbering the indicted offenses for the benefit of the jury and consisting of five counts of rape of a child and four counts of aggravated sexual battery.[4,5]

In response to the Defendant's motion for a bill of particulars, the State filed the following descriptions of the individual counts of the indictment:

| Indictment Count | Offense | Description |
|---|---|---|
| Count 20/ Amended Count 1 | Rape of a Child | [This count was dismissed at the motion for judgment of acquittal.] |
| Count 22/ Amended Count 2 | Rape of a Child | "The Defendant took the victim, S.B., into his bedroom. S.B. was approximately six to seven (6-7) years old. The Defendant laid with the victim |

---

[1] It is the policy of this court to refer to minors and victims of sexual offenses by their initials.

[2] The period specified in the indictment was between S.B.'s sixth birthday and the day before her tenth birthday. However, the bill of particulars and S.B.'s testimony only established offenses occurring when she was between six and eight years old.

[3] The first nineteen counts of the indictment alleged sexual offenses committed against B.R., the Defendant's daughter, who was between five and eleven years old during the period specified in the indictment. The counts involving B.R. were tried separately from the counts involving S.B. The trial in this case took place first in time, and B.R. testified regarding offenses she witnessed being committed against S.B.

[4] The incest counts were dismissed by the trial court before trial after finding that the incest statute did not apply to the relationship between the Defendant and S.B. See Tenn. Code Ann. § 39-15-302; State v. Dodd, 871 S.W.2d 496 (Tenn. Crim. App. 1993) (concluding that incest did not apply to a defendant and the daughter of his wife's half-sister).

[5] The judgment forms entered after sentencing reflected the numbering in the original indictment.

| | | |
|---|---|---|
| | | on his bed. He penetrated her vagina with his finger(s). While doing this, the Defendant masturbated and ejaculated on the victim. He cleaned her up afterward. This occurred around the Christmas holiday. This occurred at [the Defendant's address]." |
| Count 24/ Amended Count 3 | Aggravated Sexual Battery | "The Defendant took the victim, S.B., into his bedroom. S.B. was approximately six to seven (6-7) years old. The Defendant laid with the victim on his bed. He touched her breast. While doing this, the Defendant masturbated and ejaculated on the victim. He cleaned her up afterward. This occurred at [the Defendant's address]." |
| Count 25/ Amended Count 4 | Rape of a Child | "The Defendant was with the victim, S.B., in his bedroom. The victim was approximately eight (8) years old. M.P. was also present at this time . . . . The Defendant touched the victim and penetrated her vagina with his finger(s). While doing this, the Defendant was masturbating and ejaculated on the victim. He then cleaned up the victim. This occurred at [the Defendant's address]." |
| Count 27/ Amended Count 5 | Aggravated Sexual Battery | [This count was dismissed at the motion for judgment of acquittal.] |
| Count 28/ Amended Count 6 | Rape of a Child | "The Defendant performed cunnilingus on the victim S.B. The victim was approximately seven (7) years old. This occurred in the Defendants bedroom on the Defendant's bed. This occurred at [the Defendant's address]." |
| Count 30/ | Aggravated Sexual | "The victim, S.B., was around seven (7) |

| Amended Count 7 | Battery | years old. The victim was in the pool at [the Defendant's address]. The Defendant came up to the pool and put his hand in her bathing suit while [she was] in the pool. He rubbed her vagina with his hand. This occurred in the summer. This occurred at [the Defendant's address]." |
|---|---|---|
| Count 31/ Amended Count 8 | Rape of a child | "The Defendant digitally penetrated the victim's . . . vagina when she was approximately eight (8) years old. The victim and Defendant were in the Defendant's bedroom. The Defendant also used a vibrator on the victim's vagina. This occurred at [the Defendant's address]." |
| Count 33/ Amended Count 9 | Aggravated Sexual Battery | The Defendant rubbed the victim's, S.B., vagina over her clothing. This occurred while the Defendant was giving the victim a piggy back ride in the hallway of the Defendant's house. The victim was approximately seven to eight (7-8) years old. This occurred at [the Defendant's address]. |

The State further averred that B.R. saw the Defendant sexually abuse S.B. between two and four times.

Before trial, the Defendant filed a "Motion to Prevent Propensity Evidence," in which he sought to prevent the State from introducing evidence of "past allegations of sexual abuse against the alleged victims or any other person(s)." Specifically, the Defendant requested that the State be required to instruct its witnesses not to discuss prior acts and the prosecutor to "approach the bench before asking any questions" that could elicit testimony of prior bad acts in order for the trial court to rule on its admissibility outside the presence of the jury. The Defendant listed as an example "testimony related to or alluding to that [the Defendant] was previously accused of Aggravated Sexual Battery against [M.P.] and pled guilty to the amended charge of Reckless Aggravated Assault in

2013 in Campbell County Criminal Case No. 16044." The Defendant further requested a jury-out hearing on any additional bad act evidence the State intended to introduce at trial.

### a. 404(b) Pretrial Hearing

At a March 22, 2018 pretrial hearing, the 404(b) motion was discussed. The State averred that it could not locate M.P., who was S.B.'s step-sister, and did not intend to present evidence related to M.P.'s abuse at the trial. The prosecutor noted that if M.P. were located, her testimony would only pertain to what she saw happen to S.B.[6] The trial court cautioned the State that if it intended to offer any 404(b) evidence, the parties needed to have a jury-out hearing.

### b. Voir Dire

During voir dire, prospective juror Marie Santiago was asked whether, given the nature of the charges against the Defendant, she could render a fair verdict. Ms. Santiago responded, "I don't know because I had something similar happen to my niece, and it makes me nervous, makes me – I don't know how to explain it." The trial court interjected and asked Ms. Santiago whether she was saying that she could not abide by the oath taken by the jury. Ms. Santiago answered, "I guess not. I don't think I would be too much involved in what happened [to] my family member [in] my memory." The court again asked if Ms. Santiago could follow the oath given what she had heard from the court and the parties. Ms. Santiago then stated,

> I can't comprehend that much of that English. I speak English and I understand, but there's words that I don't know. I cannot comprehend them. I will have to – if it's a big word and my husband is there, he'[d] break it down into details of what that word actually means.

The court responded that the jury would be given "a fairly good size body of law, also definitions and things like that. These would be explained to you." The court again inquired about Ms. Santiago's "personal feelings" about the nature of the alleged offenses. She stated that although she was "very concerned about when children [were] being abused," she would do what the court was "ordering [her] to do" and follow the oath. Ms. Santiago was questioned along with the other prospective jurors regarding the proof she thought was necessary to convict, and she participated without issue. She indicated that she understood why a child might delay in reporting abuse, but later stated that she would

---

[6] For context, we note from the facts articulated in the presentence report that the allegations against the Defendant consisted of his taking M.P., B.R., and S.B. to his bedroom and molesting some or all of them, usually in the presence of one another. Because M.P.'s case was resolved by guilty plea and B.R.'s case was to be tried separately, the testimony in S.B.'s case was confined to the isolated actions against S.B. without reference to the abuse occurring to the others.

have a problem if a child's statement was the only evidence because "[k]ids lie or make stories."

Upon questioning by defense counsel, Ms. Santiago stated that she formerly managed a Subway restaurant and that English was her second language. The following exchange occurred:

[COUNSEL]: Do you think that as you listen to this trial, is it going to be hard to understand what the questions and answers are?

MS. SANTIAGO: I sure do.

[COUNSEL]: You think it's gonna be hard to follow the proof?

MS. SANTIAGO: The question[ is] that I might need some other definition to it. Like I said, my husband is my dictionary when I have big words that I need to understand . . . . He breaks down what I call big words from a lawyer . . . that I don't understand, he will break it down . . . . I never went to the school where I learned so.

[COUNSEL]: Would this trial be much easier for you if there was like a Spanish interpreter or this trial was in Spanish? Would that be something you could follow easier?

MS. SANTIAGO: Yes.

[COUNSEL]: In English, it would be difficult?

MS. SANTIAGO: A little bit harder but.

The Defendant then asked that the trial court dismiss Ms. Santiago for cause because "she [was] saying she would have trouble understanding the English language used during the trial and following the proof." The court responded, "Well, that may be true with many. I'm not prepared to do that. Overrule your motion." Ms. Santiago was subsequently excused pursuant to peremptory challenges from both the State and the Defendant.[7]

## II.    *Trial*

S.B. testified that at the time of trial she was fifteen years old and that her parents divorced when she was six years old. She stated that the Defendant was married to her

---

[7] The peremptory challenge forms were exhibited to the motion for new trial hearing. The State used five peremptory challenges, and the Defendant used all nine peremptory challenges.

father's sister.   The last time S.B. saw the Defendant was two years previously; she stated that she began to visit the Defendant's house periodically when she was in first or second grade.   The Defendant lived with his wife, his daughter B.R., and his son.   S.B. described her relationship with her aunt as close, noting that her aunt was legally blind due to a progressive eye disorder and had been since S.B. was a child.   S.B. stated that B.R. was "like [her] sister" and that B.R. was one year older than S.B.   S.B. stated that when she visited the Defendant, she and her cousins would play outside.   In addition, the following exchange occurred about what would happen during S.B.'s visits:

Q.   Were there also things that would happen there that you did not like?

A.   Yes.

Q.   Can you tell us one such thing?

A.   He molested me.

Q.   And let's – about how many times did that happen?

A.   I'm – I'm not sure.

Q.   Is it multiple?

A.   Yeah.

Q.   More than ten?

A.   Yes.

Q.   More than 20?

A.   I don't know.   Maybe.

The Defendant objected, citing Rule 404(b); the trial court sustained the objection, and a bench conference ensued that was not transcribed.

Testimony resumed, and S.B. testified that she was about six years old the first time the Defendant molested her.   In the Defendant's bedroom on his bed, he undressed S.B. and digitally penetrated her vagina while he masturbated until he ejaculated.   They were on his bed.   S.B. commented that she did not understand what was happening, although she "knew that it wasn't right."   The Defendant cleaned himself up using clothing; S.B. got dressed; and she left the room.   She did not tell anyone what happened because she

was scared of "what people would think of [her]." S.B.'s cousins and her aunt were elsewhere in the house during this episode.

S.B. described a second incident occurring when she was six or seven years old during the summer. She said that the weather was warm enough to keep the doors and windows open during the day and that she wore shorts. While S.B. was in the Defendant's bedroom on his bed, the Defendant touched S.B.'s vagina and breasts over her clothing. She felt uncomfortable, but did not tell anyone because she felt afraid and embarrassed. She said that she did not try to get away during these two incidents because she was afraid she would "get in trouble if [she] said no" and that she had been taught to "listen to adults."

S.B. described a third incident occurring when she was seven years old; she recalled that it was summertime and that she was by herself in an above-ground pool when the Defendant asked her to come over to him. The Defendant put his hand in her bathing suit bottom and rubbed the outside of her vagina. She tried to go to the other side of the pool, but the Defendant held onto her arm and prevented her from leaving.

S.B. described a fourth incident occurring near Christmas when she was eight years old. She was in the living room at night when the Defendant asked her to go to his bedroom. S.B. noted that her aunt commonly slept with her cousins in their bedroom, and S.B. spent the night in the living room. The Defendant walked S.B. to the bedroom, put her in bed, took off her pants and underwear, and digitally penetrated her vagina while he masturbated. She noted that a television and computer screen were illuminated in the bedroom. The Defendant ejaculated onto S.B.'s legs; after he cleaned her up, she went back to bed.

S.B. testified regarding a fifth incident occurring when she was eight years old; she recalled that her father was "married to someone" at the time and that it was either spring or summer. She was at the Defendant's house with her then-step-sister, M.P. S.B. was in the Defendant's bedroom, where "people watched a lot of TV." S.B. was on the bed, and the Defendant was standing. The Defendant undressed S.B. and placed a "bluish purple" vibrator made out of "rubbery" material on the outside of her vagina. S.B. noted that the Defendant only used a vibrator on her once. He had retrieved the vibrator from a "cubb[y]" in the headboard of the bed. S.B. stated that her cousins and aunt were elsewhere in the house during this incident.

S.B. described a sixth incident that occurred in a hallway in the Defendant's house. The Defendant was giving S.B. a piggyback ride and touched her genital area over her clothing. S.B. described the touching as "forced" and "with pressure" and stated that she knew that it was intentional. The touching made her uncomfortable.

S.B. described a seventh incident occurring when she was seven years old in the Defendant's bedroom. The Defendant undressed her and "lick[ed]" her vagina for "a few" minutes. She stated that she did not see anyone else there, although she also said that she was not paying attention. She stated that the incidents in which the Defendant put his mouth on her genital area occurred multiple times.

S.B. described additional incidents in which the Defendant digitally penetrated her and rubbed outside of her vagina. She stated that she was between six and eight years old and that the incidents occurred in the Defendant's bedroom. She agreed that the incidents were very similar and that it was difficult for her to distinguish between them.

S.B. testified that generally, she could not "tell anything" about the Defendant's private parts and that she did not pay attention to them. S.B. stated that the abuse stopped when she was about nine years old and started puberty. She also stopped going to the Defendant's house as frequently around the same time, when her father and step-mother got divorced. S.B. stated that she sometimes objected to going to the Defendant's house because she "knew what would happen." S.B. testified that she loved the Defendant and that she felt confused during the abuse because she "didn't understand if [she] had done something wrong or not."

S.B. testified that she was interviewed when she was ten years old regarding possible sexual abuse by the Defendant. She told the interviewer that nothing had happened to her because she "was scared of what people would think and how they would react." She said, though, that when she was ten years old she understood "the wrongfulness of what had happened" better than she had previously. S.B. was afraid of making her mother feel sad and like "she couldn't prevent it." At some point thereafter, S.B.'s mother questioned her further, and S.B. disclosed the abuse. S.B. stated that other than her initial denial, she had not told different stories regarding the abuse.

On cross-examination, S.B. acknowledged that in her first interview denying the abuse, she had promised to tell the truth. S.B. further acknowledged that her parents divorced and her grandmother died when she was six years old. She agreed that her mother stayed with various friends following the divorce and that her father quickly remarried. Her father and first step-mother divorced after two years of marriage; he had since become engaged to another woman with whom S.B. got along. S.B. acknowledged that due to the stress of "the things going on then," she was treated for self-mutilation.

In 2016, S.B. gave a second interview in which she made the allegations leading to the Defendant's being charged in this case. She acknowledged that for a time in 2015 and 2016, she identified as male, explaining that she did so in order "for other men not to look at [her]." S.B. agreed that her father's fiancée did not like S.B.'s identifying as male because she was "very conservative." B.R. supported S.B.'s gender identity at the time

and would call S.B. by S.B.'s chosen male name, which would make S.B.'s father and his fiancée angry.

S.B. acknowledged that in the second interview, S.B. told the interviewer that the Defendant had only touched her with his hands and denied that he performed oral sex or touched her with "anything else." She did not recall telling the interviewer that she had only seen the Defendant ejaculate once, although she believed that the recording of the interview would reflect such. She stated that she did not want to watch the recording to refresh her recollection, and the recording was not entered as an exhibit at trial. S.B. did not recall telling the prosecutor about multiple instances in which the Defendant used a vibrator.

On redirect examination, S.B. testified that she denied that oral sex had occurred because it "[s]ound[ed] disgusting" and made her feel embarrassed. She stated that she now knew that her fear of what people would think of her was unfounded. She stated that during her time identifying as male, she did not want "straight men or any man to look at" her and that she "thought all men would look at a girl and not a boy." She stated that as a result of the Defendant's abuse, she felt that she "could hide being a girl and not have something like that happen again." She clarified that her self-mutilation began when she was in middle school after she disclosed the abuse and underwent the second interview, which was stressful and made her "think of everything." S.B. stated that she self-mutilated because of "[w]hat [the Defendant] had done to [her]" and people at school being mean to her. S.B. thought that she still had contact with the Defendant after the interview disclosing the abuse; she noted that he visited S.B.'s grandmother, but S.B. did not go back to his house. She stated that the abuse had affected her, but that she was more confident now.

At the conclusion of S.B.'s testimony, the Defendant moved for a mistrial based upon the State's eliciting that the abuse happened more than twenty times. The Defendant argued that the testimony was proof of "uncharged conduct" such that the jury had been tainted. The State responded that it would make an election of offenses and that due to "the very nature of these cases when they are children," there was not an issue with "them testifying about multiple offenses of sex abuse[.]" The State cited this court's[8] opinion in State v. Clyde Hambrick, Jr., No. E1998-0893-CCA-R-3CD, 2000 WL 823467, at *5 (Tenn. Crim. App. June 27, 2000), for the proposition that "in cases involving multiple sex offenses, the State may introduce, evidence of uncharged assaults if the indictments addressing the charged assaults are not time specific," provided that the State elected which offenses formed the basis for the potential convictions.

---

[8] The State mistakenly stated that Hambrick was a Tennessee Supreme Court decision.

-10-

The Defendant responded, "Even by that language, asking the victim right out of the gate, did this happen more than [twenty] times is beyond the language of that case. It's certainly propensity evidence, and we would still move for a mistrial." The trial court overruled the motion and stated that it would issue a curative instruction to the jury. The curative instruction was as follows:

> The [D]efendant faces a nine-count indictment alleging a specific act for each count. Any reference to acts not specifically contained in a count cannot be considered by the jury. Further, references to the number of acts that exceed the nine counts of the indictment cannot be considered by the jury, and any such reference is stricken from the record.

The following morning before trial resumed, the Defendant renewed his motion for a mistrial, arguing that a jury-out hearing should have been held to assess the admissibility of the victim's testimony regarding the number of times the Defendant molested her. The Defendant noted that "the State just bypassed that and asked that question and had [the victim] blurt it out." The Defendant cited to State v. Rodriguez, 254 S.W.3d 361, 377 (Tenn. 2008), in which our supreme court discussed the danger of propensity evidence in child sexual abuse cases, especially where, as in that case, the only evidence was the testimony of the abused children. The Defendant noted that Rodriguez dealt with the admission of evidence of child pornography, which "[was] an uncharged act," and the Defendant's case contained testimony of "multiple other counts of sexual abuse, and we think that bell cannot be un-rung."

The trial court overruled the motion and made the following findings:

> . . . [O]ne of the reasons why we started with a . . . 30-count indictment and now we're down to nine, is the very thing that you're talking about, [counsel], that these things[,] the sheer volume of the allegations can overwhelm a jury. And I'm concerned about that, but I think we've put in a great deal of effort to not only isolate the proof from, you know, information that wouldn't necessarily go toward the guilt or innocence of someone. I think we've done what we can do, and I will continue to try to un-ring the bell, such as the bell has been rung . . . . We'll have some discussion, I'm sure later this morning about some of the proof that we heard yesterday that will further isolate what stands for guilt or innocence and what stands for just surplusage. And I don't disagree with your thought, [counsel]. I – I'm just simply not willing to grant the relief that you are asking for[.]

B.R. testified that at the time of trial, she was sixteen years old and that the Defendant was her father. B.R. testified that although she and S.B. got along, when B.R. lived with the Defendant, she did not want S.B. "to be around." B.R. explained that she

"just didn't really want [S.B.] to come over to [B.R.'s] house because [B.R.] was afraid." B.R. stated that on one occasion when she was seven or eight years old and S.B. was six or seven years old, B.R. saw the Defendant put his fingers in S.B.'s vagina in the Defendant's bedroom. S.B. was lying on the bed with her pants and underwear pulled down, and the Defendant was standing; B.R. watched the incident from the door to the bedroom. B.R. was uncomfortable and "scared" but did not tell anyone what she had seen or talk to S.B. about the incident. B.R. noted that she was afraid of "[g]etting hurt."

B.R. testified that she witnessed two or three other similar incidents during the same period of time. During one incident, S.B. "was taken to [the Defendant's] room, and he took her pants and underwear off." B.R. had followed them out of curiosity, and she watched as the Defendant touched S.B.'s vagina with his fingers, digitally penetrated her, and touched her external vaginal area with a "purple or blue" vibrator. B.R. affirmed that she loved the Defendant and that she did not wish to testify.

On cross-examination, B.R. testified that on the first occasion, she walked into the doorway midway through the incident and that she did not know if S.B. saw her. B.R. stated that she would not be surprised if S.B. never mentioned B.R.'s being in the room during the incident.

Gail Clift, an expert in pediatric sexual assault nursing, testified that it was "very rare" to find injury in children who were victims of sexual abuse. She agreed that the chance of finding an injury became more remote as time passed between the abuse and her examination.

Campbell County Sheriff's Detective Sergeant Ricky Jeffers testified that he interviewed the Defendant in connection with S.B.'s case and that she disclosed the abuse about eight years after it occurred. He noted that it was not unusual for offenses of this nature to be reported "after the fact" and that as a result, "[m]ost evidence would be gone." Sergeant Jeffers' interview with the Defendant did not produce any admissions of guilt.

At the conclusion of the State's proof, the trial court granted the Defendant's motion for a judgment of acquittal as to rape of a child in Count 1 of the amended indictment and aggravated sexual battery in Count 5 of the amended indictment, submitting to the jury four counts of rape of a child and three counts of aggravated sexual battery. The Defendant did not present any proof.

### III. State's Election

The State did not make a formal statement regarding the election of offenses at the close of the State's proof. However, the trial court read the following jury instructions:

-12-

The crime charged in each count of the indictment is a separate and distinct offense. You must decide each charge separately on the evidence and law applicable to it. The defendant may be found guilty or not guilty of any or all of the offenses charged. Your finding as to each crime charged must be stated in your verdict. The Court charges you that before a guilty verdict as to any count of the indictment is justified, the jury must unanimously find evidence beyond a reasonable doubt that the defendant committed a single act of criminal conduct for each offense charged. The State has alleged the following acts for each count:

In count two: At the [D]efendant's home . . . the [D]efendant digitally penetrated [S.B.] in his bedroom when she was approximately six to seven years old.

Count three: At the [D]efendant's home . . . the [D]efendant touched the breast of [S.B.] in his bedroom when she was approximately six to seven years old.

Count four: At the [D]efendant's home . . . the [D]efendant digitally penetrated [S.B] in his bedroom when she was approximately eight years old.

Count six: At the [D]efendant's home . . . the [D]efendant orally penetrated [S.B.] in his bedroom when she was approximately seven years old.

Count seven: At the [D]efendant's home . . . the [D]efendant touched the vagina of [S.B.] in the swimming pool when she was approximately seven years old.

Count eight: At the [D]efendant's home . . . the [D]efendant digitally penetrated [S.B.] in his bedroom when she was approximately eight years old.

Count nine: At the [D]efendant's home . . . the [D]efendant touched [S.B.]'s vagina in the hallway when she was approximately seven to eight years old.

Again, the jury must unanimously agree beyond a reasonable doubt that the defendant committed a single act for each offense charged.[9]

---

[9] These instructions, standing alone, were insufficient elections relative to Amended Counts 4 and 8, which were described using identical language and no distinguishing facts. However, this deficiency was cured by the prosecutor's closing argument and provided an "effective substitute for the missing instruction." State v. Knowles, 470 S.W.3d 416, 427 (Tenn. 2015). The State's closing argument provided sufficient

additional information about the elected offenses—it specified that Count 4 referred to the incident in which S.B. was digitally penetrated while the Defendant masturbated and ejaculated on her; Count 8, in contrast, referred to the incident in which the Defendant digitally penetrated S.B. and used a vibrator on her external vaginal area.  The prosecutor's closing argument provided sufficient detail to ensure a unanimous verdict. We emphasize that the better practice is for the State to "elect at the close of its case-in-chief the particular offense for which it is seeking a conviction."  Knowles, 470 S.W.3d at 42.

## IV. Verdict and Sentencing

Based on the foregoing evidence, the Defendant was convicted of four counts of rape of a child; he was acquitted of three counts of aggravated sexual battery. After a sentencing hearing, the trial court sentenced the Defendant to thirty years on each count, with three of the sentences to be served consecutively and one to be served concurrently, for an effective ninety-year sentence to be served at one hundred percent.

## ANALYSIS

### I. Mistrial/Evidence of Uncharged Sexual Contact Between the Defendant and S.B.

The Defendant contends that the trial court erred by denying his motion for a mistrial after the State asked S.B. whether the Defendant had molested her more than ten or twenty times. He argues that her testimony was highly prejudicial propensity evidence, implicitly referencing Tennessee Rule of Evidence 404(b), and that the court's curative instruction was not sufficient to ensure that a miscarriage of justice did not occur. The State responds that the trial court properly denied the motion for a mistrial, arguing that the evidence was admissible under the narrow exception to Rule 404(b) articulated in State v. Rickman, 876 S.W.2d 824 (Tenn. 1994), and that alternatively, the curative instruction was sufficient given the strength of the State's evidence. We agree with the State that the court did not err by declining to grant the motion for a mistrial.

The purpose of declaring a mistrial is to correct damage done to the judicial process when some event has occurred which precludes an impartial verdict. State v. Williams, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996). For a mistrial to be declared, there must be a "manifest necessity" that requires such action. State v. Robinson, 146 S.W.3d 469, 494 (Tenn. 2004); State v. Millbrooks, 819 S.W.2d 441,443 (Tenn. Crim. App. 1991). A mistrial is only appropriate when the trial cannot continue without causing a miscarriage of justice. State v. Land, 34 S.W.3d 516, 527 (Tenn. Crim. App. 2000); see State v. McPherson, 882 S.W.2d 365, 370 (Tenn. Crim. App. 1994). The decision to grant a mistrial is within the sound discretion of the trial court. State v. McKinney, 929 S.W.2d 404, 405 (Tenn. Crim. App. 1996). The burden to show the necessity for a mistrial falls upon the party seeking the mistrial. Land, 34 S.W.3d at 527. This court will not disturb the trial court's decision unless there is an abuse of discretion. State v. Adkins, 786 S.W.2d 642, 644 (Tenn. 1990). In evaluating whether the trial court abused its discretion we may consider: "(1) whether the State elicited the testimony, (2) whether the trial court gave a curative instruction, and (3) the relative strength or weakness of the State's proof." State v. Welcome, 280 S.W.3d 215, 222 (Tenn. Crim. App. 2007).

In this case, the State elicited the complained-of testimony in spite of the trial court's previous admonition to notify the court in advance of any potential 404(b) evidence

of other bad acts. We note that the evidence at issue was admissible pursuant to our supreme court's "special rule admitting evidence of other sexual crimes when an indictment charges a number of sexual offenses, but alleges no specific date upon which they occurred." Rickman, 876 S.W.2d at 828. In this case, the indictment was not time specific and alleged that the charged offenses occurred during a four-year period. The ten to twenty uncharged incidents of sexual abuse about which the victim testified occurred during that time period, and the State elected which specific incidents formed the basis of each charged offense.

Relative to the trial court's curative instruction, the jury was instructed that "[a]ny reference to acts not specifically contained in a count cannot be considered by the jury. Further, references to the number of acts that exceed the nine counts of the indictment cannot be considered by the jury, and any such reference is stricken from the record." The jury was also later instructed on the unanimity requirement, and the State described the offenses in each count in sufficient detail to ensure a unanimous verdict. We note that the jury acquitted the Defendant of three counts of aggravated sexual battery.

Lastly, the State's evidence was sufficiently strong that the Defendant was not prejudiced by S.B.'s estimate that he molested her between ten and twenty times. In addition to S.B.'s detailed descriptions of the incidents, B.R. testified that she saw the Defendant molest S.B. between two and four times and corroborated details of S.B.'s testimony regarding specific instances of abuse. In light of the witness testimony, the mention of twenty possible instances of abuse was not so prejudicial that a manifest necessity for a mistrial arose. Accordingly, we conclude that the trial court did not abuse its discretion by declining to declare a mistrial. The Defendant is not entitled to relief on this basis.

## II. Dismissal of Juror for Cause

The Defendant contends that the trial court erred by failing to discharge Ms. Santiago for cause because of her expressed difficulties with understanding English. Although the Defendant acknowledges that Ms. Santiago did not serve as a juror and that his jury was impartial, he argues that the requirement for him to use a peremptory challenge on a juror who should have been excused for cause deprived him of a fair trial pursuant to the Tennessee and United States Constitutions. As part of his argument, the Defendant urges this court to "abandon" the standard articulated in State v. Howell, 868 S.W.2d 238, 248 (Tenn. 1993), requiring that a defendant use all of his peremptory challenges and still have an incompetent juror serve in order to obtain relief on appeal. The State responds that the Defendant had an impartial jury and that this court is without authority to change caselaw established by our supreme court.

### a. *Propter defectum prospective jurors*

Both the Sixth Amendment of the United States Constitution and article I, section 9 of the Tennessee Constitution guarantee a defendant's right to an impartial jury. Prospective jurors may be excused by a trial court for cause due to "any ground for challenge for cause provided by law." Tenn. R. Crim. P. 24(c). One category of for-cause challenges is "propter defectum," which is defined as "[a] challenge based on a claim that the juror is incompetent to serve on any jury for a reason such as alienage, infancy, or nonresidency," as opposed to bias. Challenge, Black's Law Dictionary (11th ed. 2019); see Durham v. State, 188 S.W.2d 555, 557 (Tenn. 1945) (citing cases in which Tennessee courts applied the propter defectum rule). The propter defectum class traditionally includes people suffering from severe mental illness, severe intellectual disability, and other circumstances that render the prospective juror unable to intelligently weigh the evidence presented at trial.[10] See Durham, 188 S.W.2d at 557.

> It is a long-settled principle that a defendant who disagrees with a trial court's ruling on for cause challenges must, in order to preserve the claim that the ruling deprived him of a fair trial, exercise peremptory challenges to remove the jurors. Even then, however, the failure to correctly exclude a juror for cause is grounds for reversal only if the defendant exhausts all of his peremptory challenges and an incompetent juror is forced upon him.

State v. Howell, 868 S.W.2d 238, 248 (Tenn. 1993) (citing Ross v. Oklahoma, 487 U.S. 81, 89 (1988); State v. Jones, 789 S.W.2d 545, 549 (Tenn. 1990)).

Although lack of proficiency in English has not yet been addressed by Tennessee's courts as a for-cause ground for dismissal of a prospective juror,[11] common sense dictates that any state causing a total inability to comprehend the proceedings may be included in

---

[10] We do not intend to compare lack of fluency in English with intellectual disability or mental illness. As stated long ago by the Colorado Supreme Court, lack of bilingualism

> argues nothing respecting mental culture; in fact, [it] may co-exist with the highest intellectual attainments and the greatest aptitude for the duties of a juror. While this is the case, the inability of a juror ignorant of the [English] language in which the proceedings of the court are had, to discharge the duties of a juror unaided, is patent.

Town of Trinidad v. Simpson, 5 Colo. 65, 67 (1879).

[11] But see State v. George Arthur Lee Smith, Nathaniel ("Nat") Allen, and Shannon Lee Jarnigan, No. E2006-00984-CCA-R3-CD, 2007 WL 4117603, at *25 (Tenn. Crim. App. Nov. 19, 2007) (discussing lack of English proficiency as an acceptable race-neutral reason for the State's using a peremptory challenge to strike a prospective juror).

propter defectum, including the inability to understand English.   We note that this defect may be cured by the trial court, in its discretion, by offering a court-certified interpreter. See The Town of Trinidad v. Simpson, 5 Colo. 65, 68 (Colo. 1879) (holding that "[i]gnorance of the [English] language, as a matter of fact, is as conspicuously a disqualifying circumstance as though [the juror] were deaf, unless the court may aid him in the discharge of his duties through the instrumentality of an interpreter").

In this case and under these facts, we conclude that Ms. Santiago was not propter defectum, and the trial court did not err by declining to excuse her as such.   Although Ms. Santiago expressed uncertainty at understanding legal terminology and stated that it would be easier for her to have an interpreter, the record reflects that Ms. Santiago spoke English relatively well and had previously managed a Subway restaurant.   The trial court correctly noted that unfamiliarity with legal terms is a challenge for many prospective jurors. Given that Ms. Santiago participated in voir dire questioning without issue, the trial court was in the best position to determine whether Ms. Santiago's level of English was sufficiently low to disqualify her for cause.   Because Ms. Santiago did not serve on the jury and the Defendant has not shown that any of the jurors were incompetent or biased, he is not entitled to relief on this basis.

### b.  Peremptory challenges

After a jury is provisionally seated, the parties are entitled to exercise peremptory challenges as set forth in Tennessee Code Annotated section 40-18-118 and Tennessee Rule of Criminal Procedure 24(d).   Peremptory challenges are a statutory construction and "not of a constitutional dimension."   State v. Howell, 868 S.W.2d 238, 248 (Tenn. 1993) (quoting Ross, 487 U.S. at 88).   Our supreme court held in Howell that

> [a]s long as the jury that sits is impartial, the denial or impairment of the right to exercise peremptory challenges does not violate the Sixth Amendment.  In addition, because peremptory challenges are a creature of statute and are not required by the Constitution, denial or impairment of the right to exercise peremptory challenges does not violate the due process clause of the Fourteenth Amendment as long as the defendant receives what the state law provides.

Id. (citations omitted).

The Defendant's argument in this case is similar to the one presented by the petitioner in Ross, 487 U.S. at 88.   In Ross, an Oklahoma death penalty case, the trial court erroneously denied a request to excuse a prospective juror for cause.   Id. at 83.   The petitioner thereafter exercised a peremptory challenge against the prospective juror.   Id.

The United States Supreme Court held that because the juror did not serve, the petitioner's right to an impartial jury had not been violated. Id. at 85. Part of the petitioner's argument was that his Sixth and Fourteenth Amendment rights to an impartial jury were violated by his being required to use one of his peremptory challenges when that challenge should have been otherwise available to him; the defense used all nine peremptory challenges, and the prosecution used five. The petitioner contended that the makeup of the jury might have been different if he had used the additional peremptory challenge on another juror. Id. at 86-87. The Court rejected this argument, stating that the petitioner

> was undoubtedly required to exercise a peremptory challenge to cure the trial court's error. But we reject the notion that the loss of a peremptory challenge constitutes a violation of the constitutional right to an impartial jury. We have long recognized that peremptory challenges are not of constitutional dimension. They are a means to achieve the end of an impartial jury. So long as the jury that sits is impartial, the fact that the defendant had to use a peremptory challenge to achieve that result does not mean the Sixth Amendment was violated. We conclude that no violation of petitioner's right to an impartial jury occurred.

Id. at 88 (citations omitted).

In this case, the Defendant acknowledges that his jury was impartial. However, he requests that this court overturn the standard articulated in Howell as onerous on defendants by giving "an unfair advantage to the State by forcing the defense to use its peremptory challenges for jurors [who] should have been excused for cause."

As stated above, Ms. Santiago was not propter defectum such that she should have been excused for cause. In any event, it is not the province of this court to "abandon" standards established by our supreme court. Howell requires a showing of potential harm—the presence of a biased or unqualified juror on the jury panel—before relief can be granted on appeal; this concept is not unique to jury selection, and its reasoning remains sound. We note that the State, as well as the Defendant, used one of its peremptory challenges to eliminate Ms. Santiago from the jury and had no "unfair advantage" in this regard. The Defendant is not entitled relief on this basis.

CONCLUSION

Upon consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____

D. KELLY THOMAS, JR., JUDGE